## Case No. 14,816

### UNITED STATES v. CLEMENTS.

[2 Cranch, C. C. 30.] [1]

Circuit Court, District of Columbia. Nov. Term, 1811.

#### BASTARDY—RECOGNIZANCE—HOW TAKEN.

A recognizance in a case of bastardy cannot be taken by a justice of the peace, in Virginia, unless upon the application of the overseers of the poor.

This was a recognizance taken by a justice of the peace in Alexandria in a case of bastardy.

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

E. J. Lee, for defendant, moved the court to quash it because it was not taken at the request of the overseers of the poor, according to the act of assembly of Virginia of 26th December, 1792, p. 183, § 13.

## Case No. 14,817.

### UNITED STATES v. CLEMENTS.

### UNITED STATES v. REID.

[3 Hughes, 509; [1] Howison, Cr. Tr. 89.]

Circuit Court, E. D. Virginia. May 19, 1851.

#### WITNESS—JOINT INDICTMENT—NEW TRIAL—AFFIDAVIT OF JURORS.

1. In joint indictments one of the accused is not a competent witness for the others, unless he have been acquitted.

2. On motions for new trial in criminal cases affidavits of jurors ought not to be received to impeach their own verdict.

On the 4th of February, 1850, the schooner J. B. Lindsey, Captain S. S. Riggs, came into the port of St. Thomas, West Indies, with signals of distress, and on landing, the captain and two men, who composed the whole crew, reported that while at sea near Trinidad, the mate, John Heeney, and a passenger named John Walker, had been murdered by two of the crew, named Edward Clements and Thomas Reid, who had afterwards left the schooner in an open boat, and they were supposed to have landed somewhere on the Spanish main. The American commercial agent at St. Thomas, Charles H. Delavan, Esq., took prompt measures for their discovery and arrest. He had handbills printed and extensively circulated in which the men were described, and a reward of two hundred dollars was offered for their apprehension. Mr. Delavan addressed a letter to Louis Baker, Esq., American consul at Laguayra, Venezuela, inclosing one of the handbills, and earnestly asking his attention to the subject. In a very short time the following letter was received by the chief of police at Laguayra from the custom-house officer at Higuirote, a small port on the Atlantic, not far from Laguayra: "(Translation.) Custom-House, Republic of Venezuela, Comptroller's Office, Higuirote, February 11th, 1850. The Mayor of the County, Laguayra: I have passed to the honorable secretary of state on this day, under the number of 73, a communication where I inform him that a boat had reached this port with two Englishmen, who stated they came from Maracaibo in five days of navigation, and as they have not presented any document that will justify what they say, or the

---

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

place they started from, and it being very strange that a small boat should have made such a long navigation as that from Maracaibo to this port, and having stated that their voyage was for Laguayra, this custom-house has ordered the two Englishmen to pass to the port of Laguayra in the Venezuelan sloop, St. Johns, captain Elestino Ganis, and that they be presented to the mayor, so that they may be examined, and that their consul may make convenient investigation, for no civil authority whatever is in this port now that could do it. The boat, with it appurtenances, remains in this port, which you will dispose of, though said Englishmen have offered it for sale for the sum of forty dollars. I remain your obedient servant, Juan Jose Ferrai."

When these men arrived in Laguayra, Consul Baker saw them, and, comparing them with the description in the handbill, was convinced they were the same therein mentioned. He immediately wrote to Mr. Delavan, who communicated with Commodore Parker, of the United States West India squadron, and the sloop-of-war Germantown, commander, Charles Lowndes, was sent to Laguayra. In the meantime, by request of Mr. Baker, the boat, with two pistols, a dirk knife, and some other things found in it, was sent from Higuirote to Laguayra.

On the arrival of the Germantown, Lemuel Franklin and James Jackson, two of her crew, recognized the two men as Edward Clements and Thomas Reid, with whom they had served aboard the United States sloop Saratoga at Norfolk. Judicial examinations were made by the Venezuelan authorities; the tribunal of justice took the depositions of witnesses, and certified them to the office of the American consulate. In one of these depositions James Jackson testified: "Que habiendo ahora dias ido á la carcel le preguntaron duos individuos que se decia a bordo de ellos; que si sabia lo que les harian; que el esponente entonces les pregunto si era cierto que habian matado el piloto y el pasajero, y Clements le contesto; qui si no habiera sido por tres botellas di brandi que tenian a bordo no habiera sucedido nada; pero como el piloto le pego con un pasador, lo mato con un cuchillo; que entonces el pasajero corrio á auxiliar al piloto, y como estuviese Reid gobernando el timon lo dego, y corrio sobre el pasajero y lo hecho á el agua;" que el declarante, "then asked them if they had wounded the captain, and they replied they did not know he had been wounded; they had no such intention, as the captain was a very good man." On the 10th of April, 1850, by order of the president of the republic, transmitted through the governor of the province, the two men were placed at the disposal of Consul Baker, together with the boat and its accompaniments. The Germantown sailed with them for the United States, and on the 5th of June, 1850, they were brought into Norfolk by the United States steamer Vixen, lieutenant commanding, Ward, to whom they had been transferred from the Germantown. After examination they, the two men, were sent to Richmond for trial in the United States circuit court.

William T. Joynes, U. S. Dist. Atty., for the prosecution.

William P. Byrd, William A. Cocke, and Joseph M. Carrington, for Clements.

Wednesday, November 27th, 1850.

The prosecution was under the act of congress, 30th April, 1790, art. 3168,—Gord. Dig. 929, 930 [1 Stat. 112]: "If any person commit upon the high seas, or in any river, haven, basin, or bay, out of the jurisdiction of any particular state, murder or robbery, or any other offence which, if committed within the body of a county, would, by the laws of the United States, be punished with death; or if any captain or mariner of any vessel shall piratically and feloniously run away with such vessel, or any goods or merchandise to the value of fifty dollars, or yield up such vessel voluntarily to a pirate; or if any seaman shall lay violent hands upon his commander, thereby to hinder and prevent his fighting in defence of his ship or goods committed to his trust, or shall make a revolt in the ship, every such offender shall be deemed, taken, and adjudged to be a pirate and felon, and being thereof convicted, shall suffer death; and the trial of crimes committed on the high seas or in any place out of the jurisdiction of any particular state, shall be in the district where the offender is apprehended, or into which he may be brought."

The indictment contained five counts, charging the prisoners jointly with the murder of John Heeney, on the 27th of January, 1850; the murder was charged as done "piratically, wilfully, feloniously, and of their malice aforethought," on the high seas, not within the jurisdiction of any state, or of any of the United States, but within the jurisdiction of this court. (1) The first count charged the murder as committed with a pistol, discharged by Reid, Clements present, aiding and abetting. (2) The second charged the murder as committed with a pistol discharged by Clements, Reid present, aiding and abetting. (3) The third charged the murder as committed with a dirk, held by Reid, Clements present, aiding and abetting. (4) The fourth charged the murder as committed with a knife held by Clements, Reid present, aiding and abetting. (5) The fifth charged the murder as committed by both, with instruments and weapons to the (grand) jurors unknown. The indictment farther said, that the Eastern district (Fourth circuit) of Virginia, is the district and circuit to which the accused were first brought.

The prisoners elected to be separately tried, and the case of Edward Clements being ready, his trial proceeded. He appeared to be from twenty-five to thirty years old, had

light-brown hair, high cheek bones, light-gray eyes, and rather well-shaped features; his height was probably five feet nine inches. He pleaded "not guilty" to the indictment. The arraignment was joint, and each prisoner pleaded the same plea.

THE COURT (HALLYBURTON, District Judge). A question may arise as to the mode of obtaining the jury. I am of opinion that I might proceed according to the law now in force in this state, but as it has been heretofore held in full court that a prisoner is entitled to his peremptory challenges, and as I do not wish, sitting alone, to change the rule, I will allow the usual number of peremptory challenges, and then proceed to organize the jury according to the existing state law. This course will be most favorable to the accused.

The following were the jury: Peter Crew, Robert P. Richardson, Leonard Slater, W. L. McMinn, J. B. Dupuy, John A. Lancaster, William Boothwright, John D. Shell, Alex. Garrett, Charles Stebbins, Peyton G. Bayley, E. M. Porter.

For the United States:

Solomon S. Riggs, sworn.—I was captain of the schooner J. B. Lindsey during the past winter; the prisoner was on board as a sailor before the mast. On the 27th day of January, Sunday morning, we came out to sea from Port of Spain, Trinidad; we got out between 8 and 9 o'clock in the morning; things went on pretty well during the day; that afternoon a pistol was fired on deck; I was lying in my berth; I was alarmed and went on deck, and asked the mate what the pistol was fired for? He said he did not know, he would go forward and see. The mate, John Heeney, then went forward, and after awhile returned and said he would soon give me an account of it. I went to my cabin; in a short time the mate handed me two pocket-pistols; I took them and said: "They are more of men than I took them to be." My watch was out at 8 o'clock; Clements and Castello were in my watch; Reid was in the mate's watch, which was from 8 to 12. Before I left the deck I said to Clements: "Keep a good lookout, will you?" He spoke kindly and said: "Yes, sir." It was a fine moonlight night; I left the passenger, John Walker, at the wheel; the mate was also on deck; I went to the cabin and turned into my berth. Between 10 and 11 o'clock I was awakened by a sound—it may have been a pistol-shot or a shrill scream. I jumped up, caught in my hands two small pocket-pistols, and ran upon deck; the cabin had two doors, each opening to the stern; the starboard door was shut; the larboard open. When I got on deck I saw persons on the starboard side running forward, half bent, between the cabin-house and the side of the schooner. I found the mate lying by the wheel, a stream of blood running from his body to the larboard; he was groaning and crying: "Lord! have mercy on me!" I tried

to encourage him and to get him into the cabin; presently I heard some persons running aft on the larboard and starboard sides of the cabin-house; I don't know who was on the starboard, but the man on the larboard was Reid; I saw him, and saw the flash of his pistol as he fired at me; I felt myself hurt and staggered back, and fired my left-hand pistol, but missed him; I got into the cabin and sought to close the door; the cook was with me; I found my shirt bosom was all bloody; immediately afterwards three heavy blows were struck on the starboard door, and a voice, which I took to be Clements's cried: "Cook! come out and be murdered!" I think this was only to draw my attention, for instantly Reid again fired at me through the open door; I returned his fire, and when the smoke cleared I saw him lying on the deck; I think my ball struck him somewhere between the mouth and the eyes. I said to the cook: "I have got one down," and I think I said: "Now don't you look pretty, you old pirate," or something like that; I told the cook to look for my powder; I thought it was in my chest, which was opened, but presently I found it in my pocket, and loaded both my pistols; in the meantime the man lying on deck got up and went away; the cook took the two little pistols that had been handed to me by the mate, and loaded them. I put some brown paper on my throat and breast, and drank vinegar during the night; I bethought me of a small after-cabin, behind and lower than the chief cabin; I said to the cook we would get in there and defend ourselves; I slipped aside the slide, and got in and left the slide open one or two inches. We staid there until after day. Some one came on the top of the cabin-house; I went into the cabin and tried to shoot him through the stovepipe hole, but I could not get a chance, and could not see who it was. The cook and I remained in the cabin and after-cabin during Monday. In the afternoon I saw Clements in the forecastle; I could see through the run, under the cabin-deck, and a plank was off the bulkhead of the forecastle; about dusk, the cook was in the after-cabin; he cried out: "Captain! they are coming aft;" I heard one of his pistols snap, and then he fired another; we heard a noise in the hold; after awhile the cook came out and loaded his pistol, and we kept guard over the open (larboard) door. The next morning (Tuesday), at about daybreak, we saw some birds, "large landbirds," sitting on the taffrail; thinking from this that nobody could be near, the cook stepped out and shut the door, and we secured it with a lanyard. After this we heard a pistol fired in the hold, the ball from which, as I afterwards found, struck the forward bulkhead of the cabin. About 9 o'clock I looked through a crack in the forward folding door of the cabin, and saw Clements walking up and down from the mainmast forward with a horse pistol in each hand. He was too far

for me to shoot him. I did not then see Reid, but after awhile I saw him on deck, with his face tied up in a handkerchief and a pistol in each hand. Presently I heard Clements cry out to me: "Give us the boat; if you don't give us the boat we will scuttle the vessel." I made no reply that I remember. In a short time the man Castello came aft with a cutlass in his hand to the starboard cabin-door, and said something; I did not hear what he said, I was so eager to shoot him; I raised up the binnacle door and levelled my pistol at him, close at his head; the pistol snapped! Castello left and went forward. The boat was hanging astern at the davits; Clements cried out: "What do you say, can we have the boat?" I said: "Take the boat if you will go off and leave us alone." He asked: "Won't you shoot us?" I said: "No, I will not shoot you," but nevertheless I intended to shoot them through the binnacle-holes when they came aft; I thought, under the circumstances, I was justifiable in doing this. As they came aft, I saw Reid with his face tied up and a pistol in each hand. Clements and Castello had no arms that I saw. One whom I did not see shut the binnacle-slides with the muzzle of a pistol, so I could not see them; I heard the boat fall into the water; they carried her forward. Through the crack in the forward cabin-door I saw them take two coffee-pots and a tea-kettle and a pan from the galley, and I saw them cut the foot-rope of the square sail yard. I sat on my chest feeling very sad. I suspected that they would scuttle the vessel. I heard two blows struck, and thought they were scuttling her. I said to the cook, that if they scuttled her we would rush on deck and kill or be killed—that was our only hope. After this, all was quiet for a time; I heard some one running aft; it was Castello; he seemed frightened; he said: "Captain, the boat is astern!" He pulled at the door; I said: "If you pull open that door, I will kill you, if my pistol will fire." He pushed aside one of the binnacle-slides and said: "Captain, the boat is astern, if you don't believe me, look out!" I ordered him forward; he obeyed and then I opened the door and saw the boat about three hundred yards astern with Clements and Reid in it. I came out, and as Castello approached me I presented both my pistols at him, and said: "Your life is in my hands." He said: "Captain, I am innocent of this killing." (Stopped by prisoner's counsel.) I asked if he had any arms. He said he had one pistol, which he gave to the cook, who fired it off to leeward. The boat seemed to be pursuing us; we got up part of the mainsail and got under way; the last I saw of them and the boat they were bearing off easterly. Our schooner was of 119 tons, and with only two men and myself disabled we had much difficulty, but we got safely into St. Thomas.

By Joynes.—Reid, the mate, and the passenger were on deck when I went below

Sunday night; I saw Walker at the wheel at 8 o'clock that night, and have never seen him since. I saw Clements in the forecastle Monday. The cabin-house is above the deck, and from its forward door you could see the whole deck forward. A pistol was fired Tuesday morning. Clements was walking backwards and forwards from the mainmast; he had two horse-pistols (here two were produced), these are like them. The binnacle for the compass is abaft the cabin and has lights, so that when the hanging door inside is open the cabin is lighted from the binnacle. The aft larboard door had been hooked back, and remained open until Tuesday morning; before it was closed we had seen large birds sitting round on the taffrail, probably drawn by the body of the mate, which was becoming offensive. After the boat was nearly out of sight I had the body moved; it looked badly and was very offensive; I did not examine the wounds; I felt badly; it is probable the rudder ropes had chafed the legs, they had black marks upon them. I told Castello to sew him up in a hammock, and put a bag of sand to his head and feet. I read a prayer over him, and told them to commit him to the deep. I turned my back and did not see them. I never saw Castello during the affair until Tuesday morning. There were but two men in the boat; they were Clements and Reid. I got on deck about 10, and at 12 o'clock got an observation of the sun; I think my latitude was 13° 32′. When I left the deck Sunday night we were under mainsail, foresail, jib, and flying jib; when I came up the foresail was hanging, torn to pieces; I suppose the peak lashing gave way, and the throat lashing held on, and so, the gaff dropping, the sail swayed from side to side and was torn. The J. B. Lindsey hails from Norfolk, and is owned by Daniel E. Simonds, of Norfolk, William W. Simonds, of Elizabeth City, and Wallace Bray, of North Carolina.

Cross-examined by Byrd.—There were seven persons on board at 8 o'clock, Sunday night, Heeney, Walker, Reid, Clements, Castello, Smith the cook, and myself. When I was aroused and came on deck, I do not know how many persons were running forward on the starboard; I did not see Castello; the cook was in the cabin; I was in such circumstances of excitement that I could not tell how many persons were on the starboard.

Cross-examined by George Blow.—(Mr. Blow had been counsel in Norfolk and attended during part of the trial, but did not stay to argue the case before the jury.) I shipped Reid and Clements at Elizabeth City; I had found Castello aboard the J. B. Lindsey when I took her; she had just returned from Boston. Reid and Clements acted well in the cruise to Trinidad; I liked them and spoke highly of them. At Trinidad they went ashore, and two black men came alongside and said these men had sent them to

work in their places. The day we sailed, a white boy, about eighteen years old, was brought aboard without my knowledge; I thought it wrong and had him sent off. Clements after that offered to pay his passage; he said he was an acquaintance of his, and he wanted him to go to the United States; Clements and Reid went ashore with this boy. We ballasted the 26th; I thought they looked and acted "a little suspicious" then; when the mate handed me the two pistols. Sunday afternoon, and I said "they were more of men than I thought." I little thought they had a chest almost full of arms; I don't say a chestful, but I think five pistols are part of a chestful at least. When I ran out I was in my drawers, bareheaded and barefooted, with a pistol in each hand; I was alarmed because of the noise, and because I heard a man crying, "Lord! have mercy on me." I can't tell anything of the distance between the wheel and the house; the cabin floor was three steps under deck, and the top was high enough for a man to stand upright with his hat on; the larboard door was fastened back by two nails, one in the door and the other in the house. No, sir. I did not fire my pistol first at the man, at the corner of the house; he fired first; I fell back upon the wheel; I did not strike my throat on the nail in the door; I do not know that the surgeon of the Germantown ever examined me; when the pistol was fired, I did not think I was shot by the ball; I thought it probable 'twas the powder; I have never felt the ball, but it may have clipped my neck. At 10 o'clock I suppose Reid ought to have been at the wheel; with the sail that I left on the schooner if the wheel had been left she would probably have run up into the wind's eye, and shaken; I did not hear anything of this sort while in my berth. When Castello came to the door with the cutlass in his hand, I did not trust him. We found a mashed ball in the cabin, which had passed through the lid of my chest; I have no doubt this was the second ball of the two that Reid fired at me.

Re-examined by Joynes.—I did not find any more pistols, but saw balls which were brought to me from the forecastle—they were large; the mashed ball we found had too much lead in it to have been a pocket-pistol ball. After I had shot Reid and he fell, Clements cried out: "Give us the boat." I told him he should not have her, I wanted to shoot another of them. I felt encouraged having Reid down. I bought these pistols in Trinidad; I felt suspicious after the lad was found aboard, and I heard—(stopped.) I bought them because I felt suspicious. At Elizabeth City. Clements and Reid came aboard together, and Clements asked if I could give them a berth; I told them I could give one; he said one could not go without the other, so, as another man whom I had expected had not come, I shipped them both. The mate, when I found him wounded, made

no statements as to who did it. The J. B. Lindsey sailed under the "Stars and Stripes." We went into St. Thomas with colors at half-mast and Union down. Many persons boarded us, the American consul among them.

Thursday, November 28th, 1850.

Thomas Castello, sworn.—I was aboard the J. B. Lindsey. We sailed on the 27th of January, which was Sunday, from Five Islands, Port of Spain. In the afternoon, between two and four o'clock, while I was at the wheel, a pistol was fired forward. Captain Riggs was lying down in his berth; he came on deck and said something to the mate; the mate went forward; I looked forward and saw Clements with a small pistol in his hand, and one of his fingers was bleeding. In a short time Clements came up and gave the mate two small pocket-pistols, and said: "I am very much obliged to you." Nothing else occurred till about eight; Clements was at the wheel from six to eight. At eight the passenger, John Walker, took the wheel. I went forward, and Reid and Clements stood just about amidships; they had a bottle and very politely asked me to take something to drink; I took the bottle but did not drink anything. I went to the forecastle and turned in to sleep. Some time during the night I was awakened, I suppose, by the noise of pistols; I can't say what time of night it was. I got out of my berth and was going on deck, but found the forecastle doors shut; in this hot climate I generally slept with them open. I made some noise and tried to open them, but found them fastened. Presently Clements came to the forecastle with a pistol in his hand, and said if I would stay below and make no noise I would not be hurt. I did not then see Reid, but he came afterwards and told me to keep up a good heart, I should not be hurt; Clements came and talked the same way, and they kept running, first one and then the other, to the forecastle to see if I was there. I tried to get out by knocking a plank off the bulkhead of the forecastle, which had been started at sea, but finding I could not pass I lay down in my berth and took it coolly. Soon afterwards Reid came into the forecastle and said: "My God! I am shot;" Clements came directly afterwards, and stood on the steps; Reid said: "Go on deck and avenge my death, shoot somebody!" Then he said: "My pistol-ball, which I fired at the captain, was enough to knock down a horse, and yet his ball knocked me down." After awhile he said he did not believe he was as much hurt as he thought he was, and he got up, tied a handkerchief round his face, and went on deck. I then asked Clements what this row had all been about; he told me, after I came into the forecastle, Captain Riggs came on deck and told him to sway up the sails; he said he would do it about 12 o'clock; then Captain Riggs told the mate to knock him in the head with a handspike. Clements

then asked me what I was willing to do; before I could answer Reid called Clements on deck; nothing further occurred until Monday morning; I continued in the forecastle until, about 8:30 or 9 o'clock, they told me I could come on deck When I came up I saw the passenger, John Walker, lying in a pool of blood between the mainmast and the galley; I judged he was dead; Clements and Reid both had arms; each had a large pistol, and a cutlass was lying near; a small pistol was on one of them; Clements and I had quite a long conversation; I asked him who killed the passenger; he said—(here Byrd objected: We are not now on the alleged murder of Walker but of Heeney. The court said it was admissible evidence as part of the res gestæ and as illustrating the motive)—that Reid stabbed the passenger, and that he came very near getting Reid overboard and would have but for his assistance. I asked him where was the mate; he said he was abaft the house, dead! I asked who killed him; he said: "Reid stabbed him and I fired a pistol at him." Clements then told me that if I tried to go aft Captain Riggs would shoot me as quick as he would them. He then said, that they wanted me to have nothing to do with the killing until they had killed the captain, then I was to kill Smith, the cook. He asked me if I was willing to join them and not try to go aft. To save my own life I told them that I would; our conversation stopped there. Nothing remarkable occurred till about 1 o'clock, when Clements asked me to help to bring the passenger forward; I went and helped; he was dead; Clements cut both the pockets of his trowsers out; there was nothing in them but a piece of tobacco and a knife. Clements asked me to help to put him on the rail; I helped, and when the body was on the rail he took him by both feet and flung him overboard. In the afternoon they asked me what I thought they had best do; I told them I thought the best thing they could do would be to take the boat and leave the vessel. Clements was the man who talked most. Reid had very little to say at any time. Towards dark Clements told me he wanted me to go down and get the boat-sails out of the hold; we went down into the hold; a pistol was fired from aft; I was about abreast of the mainmast. We came on deck again. Afterwards Reid went down into the forecastle; Clements took a seat not far from me and said he was going to sleep; he handed me a large pistol; I sat on the end of the windlass about an hour; I judged Clements was asleep; Reid was in the forecastle; I put the muzzle of the pistol within a few inches of Clements's head and pulled the trigger; the cap exploded, but the pistol did not fire! Clements jumped up and asked me what I snapped at; I told him I thought I saw somebody aft. As soon as the cap went off, Reid came on deck; Clements took the pistol and went into the forecastle; I don't know what

he did; when he came up he and Reid sat down together and told me to go to sleep, but I did not! Nothing more occurred until Tuesday morning. We heard a noise in the cabin as if Captain Riggs was nailing something; Clements said he would go ask him for the boat; he went down into the forecastle and called to the captain, but we did not hear any answer that we could understand, and Clements could not understand either. He came on deck, gave me a cutlass (the same I had seen before), and told me to go aft and ask the captain for the boat. I went aft and asked Captain Riggs to let me come into the cabin; he made no answer; I suppose he could have shot me, as my head was where he might have blown it all to pieces. I heard no pistol snapped. I went aft and told them the captain said they might have the boat. Clements and I went down into the hold and brought up the boat-sail and rigging. He then took the fore peak-halliards and made them fast to the painter of the boat, which was hanging at the davits; he came forward and we then all went aft, and Reid got upon the house and shoved to the binnacle-slides; Clements and I cut the boat adrift; I used a small pocket-knife which I had; while we were there, Clements picked up from the larboard side of the deck a knife all covered with blood and handed it to Reid, who took it; no remark was made about it. Yes, sir, it was like this one, I think it was the same. (The knife shown in court was a dangerous weapon, with a dirk blade, about six inches long, fixed in the handle.) As soon as we cut the boat adrift we went aft and hauled her forward; the boat was on the starboard side; the schooner would come up to the wind and touch and fall off again; she was in a manner hove to. Reid went below and handed up his and Clements's clothes, mine were not touched. Clements and I rolled the water-cask forward; they sent me into the galley to bring out coffee-pots, a tea-kettle, and any victuals that might be there; I went to the galley and brought out two coffee-pots, a tea-kettle, a pan, with hardly enough of provisions for one man for a day. They filled the coffee-pots and kettle with water; Clements went down into the forecastle, and while he was there I heard a pistol fired, I suppose, by him. He soon came out; he said: "We will commence scuttling the vessel, that will entice the captain out, and we will shoot him;" I did not believe he would do it; he was all talk and gas. Previous to this I had taken the axe and hidden it behind the water-cask. Reid went into the boat, Clements and I passed in their clothes and all the other things. Clements stood behind me with a pistol in each hand; I got over the rail; Clements passed into the boat so far that he could not get back; I jumped back on board, seized the axe, and struck at the painter (boat-rope); the first blow I missed it—the second I cut it in two; I then fell down flat

on the deck, so that if they fired they might not shoot me, because of the bulwarks. They had asked me if I wanted my clothes. After lying awhile I rose and saw the boat astern; I went down into the hold, and sung out to the captain that I had cut the boat adrift, and she was astern. I heard no answer; I then went aft, turned aside the body of the mate, eased off the main sheet, and put the wheel amidships; then went to the cabin and said to Captain Riggs that the boat was astern; the captain came with a pistol and told he to go forward or he would shoot me; I went forward, eased off the jib-sheets, hauled them aft, and hoisted all I could of the foresail. I then walked aft; Captain Riggs and Smith were on deck, each with a brace of pistols; the captain said: "I have a great mind to shoot you;" I told him I had nothing to do with the row, and stated to him what I have stated here to you. He asked if I had arms; I gave him a small pistol which Reid had given to me; the cook fired it off. Some time afterwards the captain told me to take the body of the mate forward and sew it up in a hammock; one arm was in the sleeve of a large overcoat, the other sleeve was off; the coat was bloody and smelled badly; I took it off and hove it overboard. The mate's body was so offensive that I could not examine it, but I saw clotted blood on the left breast and right side; it was swelled so much that I could not make a large navy hammock meet around it. The task made me so sick that I vomited. The sides of the vessel were covered with large birds, called "boobies" in the West Indies; I did the best I could: I put a bag of sand at the head and one at the feet; the captain read a prayer, and Smith and I committed the body to the deep.

By Joynes.—I next saw these men, Clements and Reid, in the City Hall, Norfolk. I never saw them have arms before, except a small pistol; it is very common, however, for seamen to have a small knife, a dirk-knife, and a small pistol. The white boy Captain Riggs has spoken of, was at the Crown and Anchor, Port of Spain, Trinidad. Reid and Clements staid there; the mate and I sometimes went there; the boy had sometimes shown us round; he said he wanted to go to the United States; mate told him perhaps, if he asked, the captain would let him go. Reid and Clements came off Thursday night with this boy. I did not tell the captain, because I know that most rows and bad-blood aboard ship are caused by tales carried backwards and forwards between the forecastle and the cabin. The mate asked me if the boy was aboard; I told him to go and see. A black boy brought them off; I did not see any clothes. At Trinidad Reid and Clements were a good deal ashore, and they had two negro men to work in their places. The J. B. Lindsey's house was about four and one-half feet high; standing abaft I can see over the house; it may be three feet or more from the house to the wheel. I don't know who was at the wheel from 8 to 12, but I know Walker was there at 8; if nothing had occurred, my watch would have been from 12 till 4, and the captain and Clements would have been with me; I was in the forecastle from five to six minutes after 8 until Monday morning; I am sure I did not go out; when my pistol missed fire Monday night, if it had gone off it would certainly have blown Clements's brains out. It was within a few inches of his head.

Cross-examined by Byrd.—It was Clements who said they would scuttle the vessel and draw the captain out to shoot him. I had no right to believe or disbelieve whether they would scuttle her or not. I hid the axe with a view to cut the painter and cast them adrift; when the captain came on deck, I think the boat was so far astern that a pistol-shot would have done no harm. They may have gotten ashore sooner than we; we made almost as much leeway as progress. The mate and Clements were not on very good terms; the mate told me he did not like Clements because he had too much talk; he was generally called "Gassy Clements."

Captain S. S. Riggs, recalled by Joynes.—Aboard the J. B. Lindsey I had a little less than $500, in dollars, and a Colonial Bank bill for $1,154. This was known to the crew; I had cut off a third of the bill and sent it to the United States by the schooner May Flower; the crew did not know this.

Daniel J. Smith, sworn.—I was aboard the J. B. Lindsey the 27th of January, Sunday. I turned into my berth in the cabin at about 8 o'clock; the first thing I heard was, I suppose, a shriek from the mate; the captain ran on deck with his pistols; as he went up I heard a pistol fire; a short time afterwards I hear another, and the captain came running back and said he was wounded; he said to me: "I wish you would get my powder;" I went to look in the chest for it; in a short time I heard a voice which I took to be Clements's and several knocks at the starboard door; nearly at the same time I heard two reports of pistols; the captain fired one and, I suppose, shot Reid; I saw a man lying on deck whom I took to be Reid. After this, not much happened that I saw until Tuesday morning, when Clements called out to the captain to let them have the boat, and Tom Castello came aft with a cutlass in his hand; and not long afterwards he called to us that they were astern, and we went on deck and saw the boat with Clements and Reid in it.

By Joynes.—On Monday night, I think, I fired at somebody about the mainmast in the hold; my first pistol snapped, the second went off; this was the only pistol I fired until we came up; there was, I think, a pistol fired in the hold on Tuesday. I understood Clements to say to me, "Cook,

come out and be murdered;" the door on the larboard side remained open until Tuesday morning, when I shut it, and the captain and I made it fast with a lanyard; the binnacle-slides were open, but we saw them closed Tuesday morning. When we came up, I saw the mate's body; I did not examine it at all. I always slept in the cabin. In Trinidad I saw two small pistols in Clements's possession, which he offered to sell to the mate. I have seen such a knife as this (shown to him); it was lying on the deck with a couple of small pistols while we were in Trinidad; nobody had them. At Trinidad I heard Clements say, "What did the captain say about my sending off men to work?" I said, nothing. He said he had better not say anything, or he would wring his neck or his nose. In Trinidad I heard Clements say something to Castello about the freight, and heard something said about the money for the freight.

Cross-examined by Byrd.—I think the captain fired two or three times; I can't say whether he fired as he ran on deck. I was a good deal frightened; I crept into the after-cabin with the captain; when we came up, the boat was about a hundred yards astern; the boy who came aboard talked pretty good English.

Castello, recalled.—The boy was Irish; I saw no private conversation between Clements and Reid and this boy; I thought it was only for fun they had him aboard; he was about 18 or 19 years old. I don't know that he was a sailor; he attended at the bar of the Crown and Anchor.

The evidence for the prosecution closed.

For the defence, Thomas Reid was offered as a witness for the accused, who was jointly indicted with him.

Joynes.—He is incompetent.

Carrington, to sustain Reid's competency, cited Rosc. Cr. Ev. 141; 2 Starkie, Ev. 16, 17; Hawk. P. C. 4.

Joynes.—The cases relied on are either where the accomplice was a witness against the accused, or where the parties were separately indicted; I think no case can be found where the parties are jointly indicted, in which one (unless he has been acquitted) is competent for the other. Campbell v. Com., 2 Va. Cas. 314; 1 Hale, P. C. 903; Com. v. Marsh, 10 Pick. 57.

Byrd replied, citing Brown v. Com., 2 Leigh, 769; Russ. Crimes, 597; 2 Starkie, Ev. 21.

THE COURT.—If this were a new question, I should be inclined to admit the evidence. I confess I do not see much distinction in principle between cases of several indictments for the same offence and joint indictments. But the decisions are express that in the latter case the alleged accomplice is not competent for the defence unless he has been acquitted. I must exclude Reid's testimony.

The evidence closed.

Joynes, for the United States.—Rosc. 580. Where a homicide is proved to have been committed, the law presumes it to be murder, and it devolves upon the accused, from the evidence adduced either for or against him, to show that it is either manslaughter or justifiable or excusable homicide. He argued that the facts of this tragedy proved a combination between Reid and Clements, and that even though Clements had not struck a blow or raised a hand to fire a pistol, yet if he was present, ready to help, aiding and abetting, he was guilty of murder.

William A. Cocke, for the defence.—The accused is not guilty of piracy according to its legal meaning (act of congress, 1790), and according to the definition of piracy under the law of nations and the civil law. Story, Const. 405. He cannot be convicted of "making a revolt," because he is not so indicted. The act of congress makes murder on the high seas piracy, but the evidence does not make out a case of murder; it is manslaughter only at most, and that is a separate statutory offence, by act of congress. See article 3178, Gord. Dig. 933. Not being indicted for manslaughter, he cannot be convicted at all.

J. M. Carrington, for the defence, addressed the jury for an hour, commenting upon the law and the evidence.

Byrd assailed the testimony of the captain and Castello; and argued that if the jury believed a part of Clements's statement they ought to believe it all, and if they believed that the mate struck him with a handspike there was ample provocation to make the killing manslaughter. He spoke two hours, not concluding until Friday, November 29, 1851.

Joynes closed for the prosecution. He argued that there was nothing to prove that the mate struck the accused before the fatal blow was given; he vindicated the captain and Castello, and ended by an earnest appeal to the jury, fair alike to the accused and the United States.

The jury retired at about ten minutes past one, and in a quarter of an hour, returned with a verdict of "guilty."

### United States v. Thomas Reid.

The prosecution and indictment were the same as in the trial of Edward Clements. The accused appeared to be from thirty to thirty-five years old, and about five feet, eight inches high; he had dark hair and eyebrows, and a dark complexion; a slight scar was visible on his face, near the nose and eyes; his expression was not forbidding, though firm. He pleaded "not guilty" to the indictment, as before stated.

The following were the jury: James H. Gardner, William M. Sutton, William Slater, Hiram Bragg, Ira Tichenor, Edward D. Eacho, Charles G. Thompson, R. M. Allen, Thomas W. Keesee, James Phillips, Franklin Stearns, Hugh Rileigh.

William T. Joynes, for the United States. R. G. Scott, T. P. August, and A. Judson Crane, for the prisoner.

Upon request of the prisoner's counsel, the prisoner's affidavit was taken to certain statements, upon which the court directed a writ of habeas corpus ad testificandum to issue to the jailor of Henrico county jail to bring up three persons confined there, viz., Franklin Allison, Joseph J. Hall, and Edward Curtis.

Friday, December 13th, 1850.

Solomon S. Riggs, sworn.—I had some suspicions of these men in the Port of Spain. I arrived there the 17th of January, sold my cargo, went aboard the vessel, got my papers and got my cargo entered at the custom-house, engaged a large lighter called a "go-bar," and nearly loaded her; on the 18th we went on discharging. In the evening, after supper, Clements and Reid asked me for permission to go ashore; I gave it, but told them to be back by gun-fire. They were not aboard the next morning; I remarked I expected Reid and Clements were in the "calaboose." While we were working, two black men came alongside and said they had sent them to work in their places. After awhile I went ashore; at the landing Reid and Clements met me; Clements asked me how the men they had sent worked; I said: "Quite well;" Clements asked me if I would go up and take a glass of porter; in the afternoon they went aboard before I did; when I came aboard, the cook said to me he was afraid I would have trouble (stopped by Mr. Scott). On the 25th we went to Five Islands, and ballasted before sundown the 26th. In the course of the day Clements kept up a "monstrous hallooing and to do;" I thought it didn't look right; I told the mate we would go to sea early the next morning. As I was sitting aft, inclining my head near the (dacey?) I saw Reid, who seemed to be filing something; he was sitting forward on the windlass; every now and then he seemed to be peeping around the foremast at me; I did not see what he was doing, but heard the sound. These things made me a little wakeful; I did not sleep much that night.

Joynes.—Captain Riggs, where and by whom was the vessel owned?

August.—We insist that Captain Riggs cannot be permitted to prove these matters by his verbal statement; the best evidence of ownership is the register, and it ought to be produced.

Scott.—I remember that this question was before Chief Justice Marshall in a case in which I had the honor to be counsel. It was in the trial of a Chilian, accused of murder aboard a vessel which, I think, was alleged to be owned in New Bedford. The prosecution sought to prove that this vessel was owned by American citizens in New Bedford; the chief justice said the ownership must be proved, and that as the acts of

congress required registry, that was the best evidence, and none secondary could be introduced. Roscoe, i; Gilbert's Ev.; Buller's Nisi Prius. I take the principle to be this, that the law has fixed what shall be evidence of title to the vessel, and this is required to be written and matter of record in the custom-house. If the J. B. Lindsey had papers, they ought to be produced; if she had none, then when she passed upon the high seas she was not an American vessel or not entitled to peculiar protection as such.

Joynes was about to reply.

THE COURT (stopping him).—This point has been frequently raised before me, and, I believe, always in criminal cases. Suppose no registry acts had ever passed and a murder had been committed on the high seas aboard an American vessel, would it not have been punishable according to the laws of the United States? I think it would. Then, as to the registry acts; they were intended to encourage and protect our commerce; but I think that an American vessel not registered is still a vessel of the United States, and that crimes committed on board of her would be punishable according to the acts of congress. But admit that she was registered, is there anything in the acts of congress or the general rules of law making the register the highest evidence of ownership? The registry is merely the oath of a party that the vessel is owned by certain persons, reduced to writing and recorded in the custom-house. It does not seem to me to be higher evidence than the oath in open court of a witness who knows the ownership. The objection is overruled.

Witness.—She was the property of (as before stated). I think she was built in North Carolina.

Cross-examined by Scott.—I cleared for Martinique; I think I went thither and then to Trinidad for a market; I had no money going out, except five or six dollars. In the voyage out I did not observe that Reid and Clements had any arms; they behaved and worked well. They paid the black men for working; I did not. When Clements hallooed so much Saturday, it surprised me, because he had not done it before, but it is not unusual for seamen in hoisting to halloo; he made a great noise. In Trinidad I received about $500 in specie, and brought it aboard in a little bag; this was late Friday evening. Clements and Reid were in the boat with me when I brought it off. The pistols handed to me by the mate I afterwards gave to another mate who shipped with me at St. Thomas; I gave them to him in Ocracoke Inlet. I delivered my own pistols to the United States commissioner at Norfolk. There were eight berths in the cabin; the cook and I both lay in berths, he on the larboard, and I on the starboard side, but I don't know that any one outside could have seen either of us. When I ran out the mate was lying on the starboard side, his head to-

wards the rudder, his feet under the wheel-ropes; I was on the larboard side, with my head resting on a spoke of the wheel, when I heard them running back aft. I made no remark; I did not say, "Who is there?" had not time; I fired after Reid fired; yes, sir, I was alarmed; I got into the cabin as fast as possible. The second time he fired, he came round the corner of the house; his ball, as I afterwards found, struck the facing of the door and passed through the lid of my chest; I was right in front of a stand which comes out eighteen inches from the bulkhead. I fired back and he fell, with his feet near a ring-bolt in the deck.

Thomas Castello, sworn.—Reid said nothing when we were throwing the body of the passenger overboard; it took place about 1 o'clock Monday.

Cross-examined by Scott.—The city of Norfolk is my present residence. I shipped the 19th of November, 1849, at Boston, with the mate, John Heeney, aboard the J. B. Lindsey, Captain Hathaway. I have been a seaman twelve or thirteen years; when Captain Riggs sailed, we went first to San Dominique, then to Martinique, then to Tobago, then to Trinidad; there was a difficulty at Trinidad between the captain, Clements, and the cook, Smith; Reid and I were neutral; I can't say as to the day of the month; I did not keep the log-book. I introduced the passenger, John Walker, to the captain; I have seen Reid, Clements, and the passenger all pretty drunk together; when I saw them once, the passenger was beastly drunk and under the table, and Reid and Clements were fighting. The passenger said he was an Englishman and wanted to come to the United States. I must now mention what I omitted to state on my former examination. In Trinidad Clements asked me how much money there was aboard; I said five hundred dollars; he told me I was a damned liar, there was at least eighteen or nineteen hundred dollars.

Scott.—Why did you not state this before?

Witness.—Because I forgot it—it did not come to my mind. (Here a sharp colloquy took place between Mr. Scott and the witness.) I have never said since Clements's conviction that I came here to convict him, and was glad he was convicted. I deny it entirely. I never said it or anything like it, and I challenge anybody to show it.

By Joynes.—Clements's question about the money was on Monday; Reid, Clements, and I were then all standing together.

Saturday, December 14th, 1850.

Daniel J. Smith, sworn.—In Trinidad I heard Clements talk about the money; I never heard Reid say anything particularly one way or another; I heard Clements say to Reid, "I should like to take the vessel and get the money;" Reid made no reply. Clements said it would be a pretty good raise if they could get through with it; in the same

conversation he said it would be all right if they could get me; they would put Tom Castello to death and I must kill the captain. I never heard Reid say anything more than "umph, umph." One evening I went ashore; Castello set me ashore in a boat; Clements and Reid asked us if we would take something to drink; Castello said a little beer would do. They wanted me to go up to a woman's, named "Yankee Lize;" after we got up there, they asked me if I would drink a little sweet wine; I said I didn't care, sweet wine would do as well as anything else. They sent out for a bottle; Clements was mixing a dose; I thought he might be going to poison—(stopped). After a while they introduced me to "Yankee Lize," and I went with her; they went away.

Cross-examined by Scott.—I shipped aboard the J. B. Lindsey at Elizabeth City. 'Twas in January, I think. I shipped one day and was off the next. I am from South Carolina. We had been three or four days at Trinidad before I heard Clements say anything about the money. Some of our cargo was out. I don't guess they thought I heard them; I was standing near and heard. I did not state at the former trial that I heard Clements say all this about the money and taking the vessel, because I was stopped; I was commenced in the middle and stopped in the middle. Scott.—Who stopped you? Witness.—All hands and the cook. Scott.—Who? Witness.—I don't know who stopped me; I knew all this then and would have stated it, but I was stopped. Captain Riggs and I have had strife, but it is all over, and I suppose nothing is to be said about it now. The captain did once try to shoot me, but I suppose he was out of his head; he snapped one of his pistols at me the Friday after the Tuesday we came on deck; I think he must have been out of his head; at St. Thomas, the captain put me in irons, but I was taken aboard when we left and did my duty to Elizabeth City.

By Joynes.—He put me in irons because I got somewhat intoxicated; I don't know any other reason. When he snapped the pistol at me I think he was certainly out of his mind; he had been asleep not long before; I got up out of my berth and was going out when he roused up and snapped a pistol at me.

By a juror.—He said nothing, not a word was said. He gave me the pistols immediately afterwards, and told me to put them into his chest; I put them and a knife he had into his chest, and locked them up and kept the key. The captain was very unwell; he suffered a good deal from his wound; he did very little duty before we got into St. Thomas.

BY THE COURT.—I never saw any symptoms of derangement in him before.

Castello, recalled.—I do not know whether the captain snapped the pistol at Smith or myself or a tarpaulin. The man was not

rational, sir. This was on Saturday, the 2d February. He had been suffering much from his wound; I think he was not rational from his manners, his actions, his eyes, everything about him. He was often in a high state of fever. He did little or nothing in navigating the vessel; he tried to take an observation from the sun, and he made the latitude 17° 12' when we were certainly in 17° 38'. Sunday night Smith and I were obliged to take the vessel from him. We got in on the 4th of February; the captain was taken ashore by a physician.

The evidence for the prosecution closed.

For the defence:

John R. Tucker, lieutenant United States navy, sworn.—I know Reid, the prisoner; he sailed with me about twenty-eight months in a voyage to the East Indies in the United States ship St. Louis. His character was very good; he was very quiet, industrious and attentive to his duties. From all my opportunities of knowing him, I believe he had a kind and tractable disposition. We left the United States in 1843, and got back in 1845. I think he was stationed in the foretop during the whole voyage. I do not think he knew anything of navigation; I should probably have found it out if he had known anything of it. His character and conduct must have been more than ordinarily good from the fact that in so long a cruise I heard no complaint of him.

Charles F. McIntosh, lieutenant United States navy, sworn.—I know Reid well; he was in the United States frigate Saratoga with me some twelve or fifteen months in 1847 and 1848. It was in the Gulf of Mexico; I believe his character was very good; he was a very quiet, good man, and I think a great favorite with the crew. He talked very little; I may say that Reid, like all other seamen, would sometimes go ashore and get drunk, and then he was a very reckless man, but when sober he was remarkably quiet and peaceable; he had no knowledge of navigation, I think.

Franklin Allison, sworn.—I have had some conversation with Castello in the jail. The day Clements came last from court I saw Castello and Smith; I asked Castello what was the result; he said Clements was convicted and it was what he (Castello) went for, and that if his evidence would convict Reid he would do it.

Cross-examined by Joynes.—Clements was upstairs; I was downstairs; I have the privilege of going up and down stairs; I have been confined about twelve months; I am charged with horse-stealing, have never been tried; never had any conversation with Clements about this trial; I spoke to both Smith and Castello, but don't know whether Smith heard; I think I mentioned this talk to Reid; I think some of the other persons heard me talking; I never mentioned it to Mr. Winston, the jailor, and never afterwards talked to Castello. This conversation was at the lower window; I don't know whether any person was at the window above. I mentioned this to Reid the same evening; I did not like to talk to Clements because he seemed low-spirited.

Joseph Hall, sworn.—I knew Castello in St. Thomas; he was a seaman aboard the J. B. Lindsey; I went aboard the third day after his arrival and conversed with him; I remember he showed me the place on the rail where he cut the painter; he said he struck two blows. I heard some talk in the jail between Allison and Castello at the window; I understood Allison to ask him how Clements came out at his trial. Castello answered: "I have convicted Clements, and intend to do the same for Reid if my oath will do it."

Cross-examined.—Curtis and I were standing at the stove; 'twas not in a room, 'twas in a passage; the stove was three or four feet from the window; I saw Castello's face, but saw nobody with him. I told Clements and Reid about this conversation the same evening; I said nothing to others, because Reid asked me not to, as he wished to have me as a witness. Joynes.—Why are you in prison? Witness.—For refusing to work without food. Four others were convicted at the same time. I was in no vessel in St. Thomas. I had been shipwrecked and was in charge of the United States consul; I came to the United States in the schooner Joseph Barker.

Edward Curtis, sworn.—I have heard Castello speak of Clements; two weeks ago last Friday, Allison, Hall and I were in the passage by the stove; Castello passed by the window; Allison asked him how Clements's case had gone; Castello said he had convicted Clements, and would do the same for Reid if his oath would do it.

Cross-examined.—I did not see anybody with Castello; I slayed round and went upstairs; Allison and Hall did not follow me immediately; I went up and told Clements, and he said he hoped I would remember the words; I never mentioned it to Reid or anybody else. I have been in jail about a month for refusing to eat salt beef. I don't exactly know what the charge was; five of us were convicted at the same time.

At this point Mr. Joynes, at the suggestion of the court, and in justice alike to the witnesses Hall and Curtis and the United States, stated that they had been convicted at Norfolk, under the act of congress, for "conspiring and encouraging each other to disobey orders."

The evidence closed.

Mr. Joynes, for the prosecution, addressed the jury from a quarter to 2 until 3 o'clock.

Mr. Crane, for the prisoner, spoke from 4.15 to 5.30 o'clock, p. m.

Mr. August, for the prisoner, spoke on Monday, December 16th, from 10.30 a. m. until 12.15 p. m.

Mr. Scott, from 12.15 until 2.10.

Mr. Joynes closed at about 5 o'clock.

The jury retired, were kept together during the night, and returned into court on Tuesday, December 17th, 1850, at 2.30 o'clock, with a verdict of "guilty."

#### Thursday, December 19th, 1850.

A motion for a new trial in Clements's case was made and argued at length. The grounds assigned were: (1) That Reid's testimony ought to have been admitted. (2) That evidence had been admitted of the murder of Walker, another and a distinct offence, and the subject of a distinct indictment. (3) That the jury ought to have been charged as to manslaughter as well as murder; the prisoner's counsel, Byrd and Carrington, insisting that under this indictment he might have been convicted of manslaughter. (4) That new and material evidence had come to light since the trial (referring to the evidence of Allison, Hall, and Curtis).

#### Friday December 20th.

The court overruled the motion for a new trial.

#### Saturday, December 21st.

The prisoners were brought up for sentence. On being asked if they had anything to urge, Edward Clements said, in substance, that he had no hope that what he said would prevent the sentence, but he wished to make a statement: "At 8 o'clock my watch was out; I left Heeney and Walker on deck; Castéllo had gone to the forecastle; as my custom was, I took my blanket aft and laid down on deck to sleep; I was awakened by the mate, who punched me in the side with a handspike, and told me to get up and sway up the foresail; I told the mate it was not my watch, that there were two of them, and that in my watch I would do what it was my duty to do; John Walker said, if he had command of the watch, and if he were the mate, he would knock my brains out; the mate then said: 'Get up or I'll knock your brains out.' and struck me on the arm. I said I would report to the captain; a struggle took place, and I stabbed him with my sheath-knife, and he fell at my feet; the passenger interfered, and Reid killed him."

The court sentenced them, and appointed the last Friday in January as the day of their execution.

#### Thursday, January 16th, 1851.

A motion for a new trial in Reid's case was made by his counsel on two grounds: (1) That after the jury were sworn, and before they rendered their verdict, a copy of the Dispatch newspaper which contained a statement of the evidence, was read by several jurors without the consent or knowledge of the court or counsel. (2) That Reid ought to have been admitted as a witness for Clements and Clements for Reid, under section 21, c. 199, Code Va. (page 752), which reads thus: "No person who is not jointly tried with the defendant shall be incompetent to testify in any prosecution by reason of interest in the subject-matter thereof." This statute seems to have escaped the attention of the counsel for both prisoners until both trials were over. They now contended that it gave the rule in the United States courts.

Joynes.—I shall insist that the jurors are not to be heard to prove any facts by which their own verdict is sought to be assailed.

This question was fully argued, the counsel for the prisoner relying chiefly on McCaul's Case, 1 Va. Cas. 306; Kennedy's Case, 2 Va. Cas. 510.

#### Friday, January 17th.

THE COURT.—It is undoubtedly true that the courts have not admitted without great reluctance and caution the affidavits of jurors, in order to attack their own verdict. In civil cases, involving only pecuniary interests, the public inconvenience which would result from hearing such affidavits is sufficient to exclude them, but in criminal, and especially capital cases, I think the favor of the law to life and liberty is more than the argument from inconvenience. I shall therefore hear the affidavits of the jurors.

Several jurors were sworn and testified. Among them—

Charles G. Thompson, sworn.—I saw a paper in the hands of some of the jury; I don't know what paper it was; it contained a statement of the evidence in Reid's case. I probably read a quarter of a column.

By Joynes.—I think what I read was a statement of the captain's testimony; I was not at all influenced by what I read; I do not think that report was entirely accurate; I think we had heard the evidence but not the argument; I believe I read the paper before the court was opened in the morning.

Hugh Rileigh, sworn.—I read a copy of the Dispatch containing a statement of the evidence in Reid's case. I read some part of it here and some part in the jury-room. I had the paper in my pocket; I do not know that it was read by any other juror; I think it was once spoken of: the report I thought accurate, but I did not read it particularly.

By Joynes.—I got the paper at my store; I am a subscriber for it, and pay by the week. I was not at all influenced by what I saw in the paper.

BY THE COURT.—I sometimes referred to it for the purpose of refreshing my memory, but if I found there any statement which I did not recollect at the trial, it had no influence on me; I read more from curiosity than otherwise. My impressions were not altered as to the question of "guilty" or "not guilty" from first to last.

The motion for a new trial was elaborately argued for the prisoner by Scott and Crane, and for the United States by Joynes.

THE COURT.—As these cases and the questions that have been raised are of great importance, I shall not now decide the motion, but shall adjourn it to the next term, when it is probable the chief justice may be

sitting here.. In the meantime I shall set aside the judgments.

### Friday, May 14th, 1851.

Hon. ROGER B. TANEY, Chief Justice of the United States, and Hon JAMES D. HALLYBURTON, District Judge, sitting.

The motion for a new trial in Reid's case came up for reargument.

Joynes.—I shall again insist that the jurors ought not to be heard at all against their own verdict, but for convenience and for the purpose of saving time this question may be argued with the others that arise.

TANEY, Chief Justice.—If it will not disturb too much the course of argument for which the prisoner's counsel have prepared themselves, the court would prefer that. this question as to the admissibility of the juror's statements shall be argued first in order.

Crane.—1. As to the admission of the jurors' affidavits. 5 Bac. Abr. 369; Metcalfe v. Deane, 1 Cro. Eliz. 189; Com. v. McCaul, 1 Va. Cas. 306; Overbee's Case,. 1 Rob. [Va.] 756; 5 Pick. 296; 13 Mass. 217.

As to the competency of Reid for Clements and of Clements for Reid, I cite first our statute, Code Va. 1849, p. 752. The construction of this seems plain, and I suppose if this prosecution were in the state court, the question would be promptly decided. Does this act give the rule of evidence in the United States courts? I insist that it does. Section 34, Judiciary Law 1789 [1 Stat. 92]; Gord. Dig. p. 125. § 534. The laws of the several states are rules of decisions in trials at common law. Burr, Tr. 481, contra; [Wayman v. Southard] 10 Wheat. [23 U. S.] 1; [Polk v. Wendal] 9 Cranch [13 U. S.] 98; [The Orleans] 11 Pet. [36 U. S.] 175; [McNiel v. Holbrook] 12 Pet. [37 U. S.] 84; Hamilton's Argument on the Judiciary in the Federalist.

3. As to the effect of the jurors' evidence in vitiating the verdict; Wheat. Cr. Law, 644, 645; 5 Bac. Abr. (Ed. 1844) 369; 2 Hale, P. C. 296; 2 U. S. Dig. 1849, p. 695; 5 Supp. U. S. Dig. 435; Overbee's Case, 1 Rob. [Va.] 756; 12 Pick. 496; 1 Pick. 337; 13 Mass. 217; Com. v. McCaul, 1 Va. Cas. 306.

Joynes.—1. The affidavits of jurors ought not to be admitted to prove their own misbehavior. This is the settled English rule, commencing with Vasie v. Delaval, 1 Term R. 11; 1 Chit. Cr. Law, 655; Grah. New Trials, 111; Straker v. Graham, 4 Mees. & W. 721; Burgess v. Langley, 5 Man. & G. 722. The same rule prevails generally in. the United States. Whart. Cr. Law, 655. It is the rule in criminal as well as civil cases. Rex v. Wooller, 6 Maule & S. 366; State v. Freeman, 5 Conn. 348; Com. v. Drew, 4 Mass. 398; Suttrel v. Dry, 1 Murphy, 94; State v. McLeod, 1 Hawk. 344. In Tennessee such affidavits were held. admissible in criminal cases in Crawford v. State, 2 Yerg. 60; but the practice has since been regretted and characterized as dangerous, and a disposition expressed to restrict it. Norris v. State, 3 Humph. 333. Commented on. McCaul's Case, Kennedy's Case, and Overbee's Case. In all of them affidavits of the jurors were either accompanied by other evidence or designed for their exculpation. See Cochran v. Street, 1 Wash. [Va.] 103; Moffet v. Bowman, 6 Grat. 219; Price v. Warren, 1. Hen. & M. 385; Shobe v. Bell, 1 Rand. [Va.] 39; Harwell v. Bennett, Id. 282; Harnsbarger v. Kinney, 6 Grat. 287.

2. As to the competency of the accused for each other. Section 21, p. 752, Code Va., gives no rule in this court. [Wayman v. Southard] 10 Wheat. [23 U. S.] 49; U. S. v. Marchant, 12 Wheat. [25 U. S.] 480; U. S. v. Shive [Case No. 16,278]; U. S. v. Wilson [Id. 16,730]; U. S. v. Insurgents [Id. 15,443]; 2 Burr, Tr. 481; Chase, Tr. 165, Append. 34. The thirty-fourth section, Gord. Dig. p. 334, adopts only rules of property. [Swift v. Tyson] 16 Pet. [41 U. S.] 1. See McNiel v. Holbrook, 12 Pet. [37 U. S.] 84. If it adopts rules of evidence in criminal cases, then there will be no uniformity, and a man accused of piracy would be acquitted in one state and convicted in another. But if section 21, p. 752, Code Va., gives the rule here, still I insist it has not altered the common law which excludes accomplices for each other. This section only applies to witnesses in support of the prosecution. 1 Rev. Code, 581, 582; Acts 1847–48, p 124; Rep. Revisors, 987. The construction of this act insisted on for the prisoner would deprive this court of its discretionary power as to granting separate trials to parties jointly indicted. See U. S. v. Marchant, 12 Wheat. [25 U. S.] 480.

4. As to the facts said to be proved by the jurors. They are no ground of new trial. Thomas' Case, 2 Va. Cas. 479; McCarter's Case, 11 Leigh, 633; 12 Pick. 496; 1 Hill, 207; 6 Leigh, 1; U. S. v. Gibert [Case No. 15,204]; Trial per pais, 218, 223, 225, 229; Grah. New Trials, 47; Rex v. Woolf, 1 Chit. 401.

Scott replied. commenting upon the authorities cited by Joynes, and citing Grah. New Trials, 109, 161; 5 Pick.; Grayson's Case, 6 Grat. 712. If the state law does not give the rule of evidence. a negro would be competent in the Southern states to testify against a white man in the United States courts!

THE COURT heard the statements of such of the jurors as were willing to make them, as to the reading of the Dispatch and its effect upon their minds.

### Monday, May 19th.

TANEY, Chief Justice. Judge HALLYBURTON and myself differ as to two points arising upon this motion. (2) He thinks Reid's testimony admissible upon a proper construction and application of section 21, c. 199, Code Va. I should concur with him if I regarded this a mere question of evidence,

but I think it goes deeper, and affects the discretionary power of this court as to granting several trials upon joint indictments. This rests in the sound discretion of the United States courts, but if this act of Virginia applies as contended for the prisoner would have a right to insist upon separate trials. I think, therefore, the act does not apply. (2) Judge HALLYBURTON also thinks a new trial ought to be granted on the statements of the jurors. I do not think affidavits of jurors ought to be received to impeach their own verdict, but even if received the statements of the jurors in this case seem to me no ground for a new trial. Upon a certificate of this division of opinion between Judge HALLYBURTON and myself the question in these cases will go to the supreme court of the United States for decision.