### SOLOMON v. UNITED STATES.

(Circuit Court of Appeals, First Circuit. February 26, 1924.)

No. 1671.

1. **Criminal law** ⟐1069(6)—**Writ of error regarded as allowed when presented where delay was by action of court and not of plaintiff in error.**

Where a writ of error was presented for allowance within the time limited by statute, and delay in the allowance and issuance of the writ was due to the action of the court and not of plaintiff in error, its allowance

---

⟐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

will be regarded as having been made as of the date of its presenting rather than as of the date when it was in fact allowed.

2. **Jury** ☞136(6)—**Defendants tried together deemed single party for purpose of peremptory challenges to jurors.**

Under Judicial Code, § 287 (Comp. St. § 1264), providing for peremptory challenges to jurors and that "where there are several defendants or several plaintiffs the parties on each side shall be deemed a single party for the purposes of all challenges under this section," a number of defendants indicted and tried together are entitled to no more challenges than a single defendant.

3. **Criminal law** ☞166½(12)—**Comment by court on credibility of witness held not prejudicial where in effect withdrawn.**

A statement by the judge in ruling on testimony that he assumed the witness was telling the truth until the contrary appeared *held* not prejudicial error, where, on exception, it was in effect withdrawn, and the jury told that the credibility of the witness was for their determination.

4. **Perjury** ☞32(9)—**Affidavit of witness prior to giving alleged false testimony held admissible to show state of mind at time of testifying.**

On a trial for subornation of perjury in inducing a witness to give false testimony in a previous case, an affidavit made by the witness before the previous trial and inconsistent with her testimony at that trial *held* competent to show what her state of mind was as to the truth when she testified.

5. **Criminal law** ☞1137(5)—**Action of court taken at request of defendant not assignable by him as error.**

A defendant cannot assign as error that the jury were permitted to consider an affidavit on a question as to which it was incompetent, where it was done at the request of his counsel.

6. **Witnesses** ☞345(1)—**Record of conviction of crime which would render witness incompetent at common law is competent to affect his credibility.**

Under the modern rules enlarging the domain of competency, where a crime of which a witness has been adjudged guilty was such as at common law would have rendered him incompetent, the record of his conviction is now competent evidence to affect his credibility.

7. **Witnesses** ☞345(1)—**Record of conviction of a witness of a misdemeanor held not admissible to affect his credibility.**

The record of the conviction of a witness of a misdemeanor, which would not under the general common law or the common law of the state have rendered him incompetent as a witness, is not admissible to affect his credibility.

8. **Criminal law** ☞656(3)—**Comment by the court on striking out testimony held prejudicial error.**

A statement by the court in striking out the answer of a witness for the prosecution, which was clearly incompetent and prejudicial, from which the jury would understand that it was not prejudicial to defendant, but that its exclusion might be prejudicial to the government, *held* error.

In Error to the District Court of the United States for the District of Massachusetts; George W. Anderson, Judge.

Criminal prosecution by the United States against Charles Solomon. Judgment of conviction, and defendant brings error. Reversed.

See, also, 297 Fed. 95.

William H. Lewis, of Boston, Mass., for plaintiff in error.

Laurence Curtis, Second Asst. U. S. Atty., of Boston, Mass. (Robert O. Harris, U. S. Atty., of Boston, Mass., on the brief), for the United States.

Before BINGHAM and JOHNSON, Circuit Judges, and HALE, District Judge.

BINGHAM, Circuit Judge. The plaintiff in error, Charles Solomon, was indicted jointly with others in the United States District Court for Massachusetts and found guilty upon the first and fourth counts. The first count charged him with subornation of one Rose Shaffer to commit the crime of perjury in violation of section 126 of the Criminal Code (Comp. St. § 10296). The fourth count charged him with impeding the due administration of justice by influencing and intimidating said Rose Shaffer, a witness in behalf of the United States at another trial against said Solomon and one Ferino in said District Court, in violation of section 135 of the Criminal Code (Comp. St. § 10305). January 23, 1923, Solomon was sentenced to five years at hard labor in the penitentiary at Atlanta, Ga., and to pay a fine of $1,000.

It appears that Solomon and Ferino were indicted in the District Court at the June term, 1922, for having in their possession certain drugs in violation of the Narcotic Act; that on October 10, 1922, Solomon was tried on said charge and acquitted; that at that trial Rose Shaffer was called as a witness for the government and refused to identify Solomon as the man who had hired a closet in her house where the drugs were found, and also denied certain portions of an affidavit made by her to the narcotic agents which appears in the record.

At the trial on the present indictment upon which Solomon was convicted, Rose Shaffer was called as a witness by the United States and testified that the testimony given by her at the previous trial of Solomon in October, 1922, was false; and gave testimony inferentially tending to show that she was induced by Solomon to perjure herself.

The errors complained of relate (1) to the number of challenges permitted the defendants; (2) the comment of the court upon the credibility of Rose Shaffer; (3) the admission of an affidavit made by Rose Shaffer to one Scannell, a narcotic agent; (4) the admission of a record of a previous conviction of Solomon for the purpose of impeachment; (5) the admission of the testimony of Rose Shaffer to the effect that one of the defendants showed her a newspaper clipping stating that Solomon had served 18 months; and (6) the admission of the testimony of Rose Shaffer that she had employed a lawyer named Weiner and told him the whole story.

[1] The government has moved to dismiss this proceeding on the ground that the writ of error was not allowed or sued out within the time prescribed by section 11, chap. 517, of the Act of March, 1891 (26 Stat. at Large, 829; Comp. Stat. § 1647); and that this court is therefore without jurisdiction. We think this motion must be denied. The sentence under review was imposed January 23, 1923. On July 13, 1923, counsel representing the plaintiff in error filed his petition for a writ of error, an assignment of errors, and a motion, and on the 16th of July appeared before the judge having the case in charge and requested a hearing upon his motion and the allowance of his writ of error. The district attorney objecting to proceeding with the hearing at that time, the judge fixed July 24, 1923, for hearing the motion and

the allowance of the writ, on which date he allowed the writ of error upon which citation issued and was forthwith served.

As the writ of error was presented for allowance within the time limited by the statute and the delay in the allowance and issuance of the writ was due to the action of the court and not of the plaintiff in error, its allowance is to be regarded as having been made as of the date of the presentment of the writ rather than as of the time when it was in fact allowed. Randall Co. v. Foglesong Mach. Co., 200 Fed. 741, 742, 119 C. C. A. 185; Toledo Metal Wheel Co. v. Foyer Bros. & Co., 223 Fed. 350, 351, 138 C. C. A. 612; United States v. Adams, 6 Wall. (73 U. S.) 101, 107, 18 L. Ed. 792; Latham v. United States, 131 U. S. Appdx. xcvii, 19 L. Ed. 452.

[2] The first assignment relates to the ruling of the court at the time the jury was impaneled to the effect that all the defendants should be treated as one and entitled to only 10 peremptory challenges. The contention of the plaintiff in error is that each defendant was entitled to 10 such challenges. Section 287 of the Judicial Code (Comp. Stat. § 1264) provides:

"When the offense charged is treason or a capital offense, the defendant shall be entitled to twenty and the United States to six peremptory challenges. On the trial of any other felony, the defendant shall be entitled to ten and the United States to six peremptory challenges; and in all other cases, civil and criminal, each party shall be entitled to three peremptory challenges; and in all cases where there are several defendants or several plaintiffs, the parties on each side shall be deemed a single party for the purposes of all challenges under this section. * * * *"

This assignment of error is without merit. The meaning of the last clause of this section is what it says: That in all cases (civil or criminal) where there are several defendants they shall be deemed a single party as to all challenges under this section. This is the construction placed upon it by the courts. Stilson v. United States, 250 U. S. 583, 40 Sup. Ct. 28, 63 L. Ed. 1154; Schaefer v. United States, 251 U. S. 466, 40 Sup. Ct. 259, 64 L. Ed. 360; Schwartzberg v. United States, 241 Fed. 348, 154 C. C. A. 228. And such has been its application where separate indictments against different defendants have been consolidated under Revised Statutes, § 1024 (Comp. St. § 1690). Krause v. United States, 147 Fed. 442, 78 C. C. A. 642; Emanuel v. United States, 196 Fed. 317, 116 C. C. A. 137. If the defendants had been indicted separately and for convenience tried together (Rev. Stat. § 921 [section 1547]), each defendant would have been entitled to 10 challenges the same as he would if he had been tried separately. Mutual Life Insurance Co. v. Hillmon, 145 U. S. 285, 12 Sup. Ct. 909, 36 L. Ed. 706; Betts v. United States, 132 Fed. 228, 65 C. C. A. 452. But this is not such a case.

[3] The second assignment relates to a comment of the trial judge in support of the credibility of Rose Shaffer during her cross-examination by counsel for Solomon, she being the person Solomon is charged with having procured to testify falsely at the narcotic trial in October, 1922, and the chief witness for the government to sustain the present indictment against Solomon. In the cross-examination counsel was endeavoring to have this witness answer his questions of her

own knowledge and not what some one told her, when the court informed him that he was not quite fair with the witness, stating that "when you ask what she knows, or as far as she knows, you open the door inevitably to her telling you what somebody told her." Counsel replied: "I am trying to be fair." Whereupon the court said: "When you ask those questions, the witness, if she is trying to tell you the truth, and I assume she is until the contrary appears, will answer what somebody told her." Counsel then excepted to this remark, saying: "I think it is for the jury to say she is telling the truth." The court replied: "I disallow it. A proper remark to make in making rulings. I refuse an exception to that. The jury will understand the question as to whether the witness is telling the truth is for them. They will understand that in the rulings the court makes the court does not assume the witness is telling a falsehood or is not telling a falsehood. It is a question of fact for the jury."

Counsel for the plaintiff in error contends that, inasmuch as the testimony of Rose Shaffer, a self-confessed perjurer, constituted practically the sole evidence upon certain material questions and whose credibility was of vital consequence in the case then on trial, it was highly improper and prejudicial for the court to undertake to bolster up her credibility in the manner above indicated. Were it not for the fact that the court subsequently in effect withdrew his comment and told the jury that the question whether the witness was telling the truth or not was for them to determine, we would be inclined to regard this as prejudicial error. But, under the circumstances, we think the plaintiff in error takes nothing by this assignment.

[4] The third assignment relates to the introduction in evidence during the examination of one Scannell, a narcotic inspector for the government and called by it as a witness, of an affidavit given by Rose Shaffer to him on the 26th of January, 1922, a month or more after a raid was made by police officers at the home of Rose Shaffer, on which occasion they seized narcotic drugs which she testified at the trial in this case were found at her house in a closet she rented to Solomon and Ferino. Scannell testified that he procured the affidavit on the 26th of January, 1922, and that about a week before the narcotic trial, which took place October 10, 1922, he saw her and went over the statement with her again. The witness was then shown a paper and testified it was the affidavit given by Mrs. Shaffer; that it was in his handwriting; and that he read it over to her two or three times before she signed it. The affidavit was then offered and received in evidence, the plaintiff in error having excepted to the questions leading up to its introduction and to the affidavit itself. The affidavit reads as follows:

"Treasury Department,

"Internal Revenue Service.

"Office of Narcotic Agent in Charge Boston Division.
"Boston, Mass., Jany. 26, 1922.

"I Rose Schaefer of 7 Walnut Park Road, Roxbury, Mass., depose and state that about 3 years ago I rented a room to a man who gave me the name of Mr. Myers, whom I have since learned to be Charles Solomon, and gave him a key to same at 69 Holworthy St., Roxbury. He brought a young man called Tony, and instructed me not to allow any one in the room except

Tony. Trunks were brought to this room and Solomon came when the trunks arrived or a short time later. Tony would come and go, sometimes alone and on one or two occasions with Solomon.

"Officers came and seized two trunks in this room in my house, opened it and I saw packages of drugs, and bottles containing powder, labeled morphine and cocaine.

"Since that time neither Solomon or Tony have come to this room.

· "I sent a letter addressed to Charles Solomon, 37 Middlesex St., Boston, Mass., about December 20, 1921, requesting that he pay $24.00 which he owed for the room. He called me up by 'phone and said 'What is the idea of writing a letter to me as you know that they open my mail. Tony is good for the money.' I replied that 'I want the money to buy the kids Christmas gifts,' and he talked angry and hung up the 'phone.

"I saw a woman in a big machine outside the house with Solomon, whom I was told was his wife, on one occasion.

"Solomon told me not to let any one know that he came here, and if any one asked for him to say 'I don't know him.' Solomon paid me $6.00 for a week's rent when he first hired the room.

"Tony called me up after I sent the letter to Solomon asking for the $24.00 rent and said: 'What is the idea of writing a letter to Charlie. They open the mail. I'll make good for it.'          Mrs. R. Shaffer.

"Subscribed and sworn to before me this 26th day of January, 1922.

"William P. Scannell, Narcotic Inspector.
"Charles J. Walker, Narcotic Agent."

Rose Shaffer, called by the government, testified in this case that she had lived at 7 Walnut Park Road, Roxbury, for two years; that prior to that she had lived at 69 Holworthy street, Roxbury; that about three years ago a fellow by the name of Lewis Stone brought Mr. Myers to her house at 69 Holworthy street to rent a room.

She then identified Charles Solomon, who was present in court, as the person who had called at her house under the name of Myers. She testified that Myers rented a room at $6 a week, and put in it suit cases and trunks; that he told her if anybody called to say that he did not live there and not to let anybody in but Ferino; that Ferino came frequently to the room and that Myers came there once in a while; that after she moved to 7 Walnut Park Road she rented a closet to Ferino; that Myers came there twice; that in the autumn of 1921 some police officers searched the house and opened a trunk in which were bottles and packages; that Mrs. Marks (one of the defendants) told her that Myers' name was Solomon and not Myers; that in consequence of this she wrote a letter addressed to Charles Solomon, 37 Middlesex street, asking for payment of rent; that the letter was returned bearing the notation, "Does not live there"; that a day or two later she was called on the telephone by a person whose voice she recognized as Solomon's; that the person said: "What was the idea of sending the letter? Tony [meaning Ferino] is good for the money and they open up my mail"; that later (January, 1922) she made a sworn statement before two narcotic inspectors; that on Sunday night preceding the trial of Solomon (in October, 1922) Mrs. Marks requested her to go to her apartment, two floors below; and that she went there. She further gave testimony from which it might be inferred that on that occasion she was offered money through Mrs. Marks to change her testimony from what she had stated in the affidavit; that the next night she was requested by Mrs. Marks to go to Mrs. Godat's

house (Mrs. Godat was one of the defendants); that she went there; that Mrs. Marks, Mrs. Godat, and Mr. Myers—Mr. Solomon—were there; that Solomon said: "Do you want to see Tony and me go to jail? * * * I didn't do no harm to you; we always treated you right. My wife is sick. Why should you send us to jail?" That she said: "I have got nothing against you and I don't want to see anybody in jail." That he replied; "Don't be afraid; nothing will happen to you. If anything happens, I will put up $3,000 in Mr. Godat's hands and protect you." That he also said that she should say everything in the affidavit except that she did not know who Myers was; that Mrs. Marks kept saying, "Say you ain't sure it is him." That the next day she took the witness stand and said that she did not know Solomon, that she did not recognize him. She further testified that what she had testified to at the narcotic trial was false, and her sworn testimony given at that trial was received in evidence in this case.

[5] The plaintiff in error contends that the affidavit was improperly received in evidence; that it was a mere self-serving declaration introduced and used for the purpose of giving credit to the testimony of the witness in this case. While we do not regard the affidavit as competent for the purpose of showing that the testimony Mrs. Shaffer gave at this trial was true, we do think it was competent to show what her state of mind was as to the truth of the matter at the time she testified at the trial of Solomon in the narcotic case; that upon that question it was original evidence. It seems, however, that the jury were permitted to consider the affidavit upon the question whether Mrs. Shaffer was telling the truth when she gave her testimony in this case. But Solomon cannot complain of this, for it appears that his counsel requested the court to instruct the jury "that they can use the affidavit to determine whether or not she is telling the truth in this case." Under the circumstances the plaintiff in error takes nothing by this assignment.

[6] Solomon took the stand in his own behalf and, on cross-examination, the District Attorney was permitted to ask him if he was convicted of keeping a house of ill fame on October 28, 1912, and also to introduce a record in the superior court of Massachusetts, in which it appeared that Solomon was charged with having on the 28th day of March, 1911, kept and maintained in the city of Boston a tenement resorted to for prostitution and lewdness, of which offense, on the 28th day of October, 1912, he was found guilty and fined $100. The fourth assignment of error relates to this matter. In support of his exception to the introduction of this evidence counsel for Solomon contends that at common law a defendant in a criminal case was not a competent witness and that prior to the act of Congress of March 16, 1878 (20 Stat. at Large, chap. 37; U. S. Comp. Stat. § 1465), by which a defendant was made a competent witness in a criminal case, no record of conviction of an offense found against him in a federal or state court in the district or state in which he was being tried could be introduced in evidence to impeach his credibility, and that, having been made a competent witness by statute, such evidence could not be used except where there is a statute of the United States permitting it, or where, by the law of the state in the district where the trial is had, such evidence was

admissible when the courts of the United States were established by the Judiciary Act of 1789 (1 Stat. 73).

There is no federal statute authorizing the use of such evidence for this purpose and no case has been called to our attention where the Supreme Court has decided this precise question. United States v. Reid, 12 How. 361, 13 L. Ed. 1023, was decided by the Supreme Court in 1851, prior to the act of 1878 making a defendant a competent witness in a criminal case. In that case Reid and Clements had been jointly indicted in the United States District Court of Virginia for murder. They were tried separately. At this trial Reid proposed to offer Clements as a witness in his behalf. The District Court rejected the testimony, being of the opinion that as he was jointly indicted with Reid he was not a competent witness. A statute of Virginia, passed in 1849, rendered a person who was not jointly tried with the defendant competent. The Supreme Court held that Clements, who was called by Reid, was not a competent witness; that the law of Virginia of 1849 (Code 1849, c. 199, § 21) was not applicable; and that "the rules of evidence in criminal cases are the rules which were in force in the respective states when the Judiciary Act of 1789 was passed."

Benson v. United States, 146 U. S. 325, 13 Sup. Ct. 60, 36 L. Ed. 991 (decided in 1892), was a case where Benson was indicted in the Circuit Court of the United States for the District of Kansas jointly with Mary Rautzhan for murder. Before the trial of Benson a severance was ordered and Mary Rautzhan, who had not been tried, was called as a witness by the government at the trial of Benson, and her testimony was received. One of the questions raised in the case was as to her competency as a witness, Benson having been found guilty. In the opinion in that case it was stated that—

"At common law, although there is a contradiction in the cases, the preponderance of authority seems to favor the admission of a codefendant, not on trial, as a witness, if called by the prosecution."

After reviewing the authorities on the question the opinion proceeds:

"But it is said that this court has already practically decided this question in the case of United States v. Reid, 12 How. 361. The precise question in that case was as to the right of the defendant to call his codefendant, and not that of the government to call the codefendant, and a distinction has been recognized between the two cases. It is true that the reasons given for the exclusion of the witness in one are largely the same as those given for his exclusion in the other, to wit, interest and being party to the record; but public policy is also urged in favor of the exclusion of one defendant as a witness for his codefendant, for each would try to swear the other out of the charge. And as the distinction prevailed, whether founded on satisfactory reasons or not, it is sufficient to justify us in holding that that case is not decisive of this. Further, the stress in that case was not on this question. The defendant was indicted and tried in the Circuit Court of the United States for the District of Virginia. A statute had been passed in that state, in terms permitting a codefendant when not jointly tried to testify in favor of the one on trial, and that statute was invoked as securing the competency of the witness, and the question which was discussed was whether the existing statute law of Virginia controlled, and it was held that it did not, and that the question was to be determined by the common law as it stood in Virginia at the date of the Judiciary Act of 1789. It was assumed both in this court and the Circuit Court, 3 Hughes, 509, 539, 540, that by that law the codefendant was incompetent. It was not affirmed that such was the rule in

the mother country or in the other states of the Union. We do not feel ourselves, therefor, precluded by that case from examining this question in the light of general authority and sound reason."

After pointing out that under the common law as formerly understood the reasons for excluding a codefendant were his interest, and the fact that he was a party to the record and that the reason for the rule was fear of perjury, the opinion proceeds:

"Nor were those named the only grounds of exclusion from the witness stand; conviction of crime, want of religious belief, and other matters were held sufficient. Indeed, the theory of the common law was to admit to the witness stand only those presumably honest, appreciating the sanctity of an oath, unaffected as a party by the result, and free from any of the temptations of interest. The courts were afraid to trust the intelligence of jurors. But the last fifty years have wrought a great change in these respects, and today the tendency is to enlarge the domain of competency and to submit to the jury for their consideration as to the credibility of the witness those matters which heretofore were ruled sufficient to justify his exclusion. This change has been wrought partially by legislation and partially by judicial construction. By Congress, in July, 1864 (Rev. Stat. § 858) it was enacted that 'in the courts of the United States no witness shall be excluded in any action on account of color, or in any civil action because he is a party to or interested in the issue tried,' with a proviso as to actions by and against executors, etc. And on March 16, 1878, it also passed an act permitting the defendant in criminal cases to testify at his own request. 20 Stat. 30, c. 37. Under that statute, if there had been no severance and the two defendants had been tried jointly, either would have been a competent witness for the defendants, and though the testimony of the one bore against the other, it would none the less be competent. Commonwealth v. Brown, 130 Mass. 279. The statute in terms places no limitation on the scope of the testimony, for its langauge is 'the person so charged shall at his own request, but not otherwise, be a competent witness.' His competency being thus established, the limits of examination are those which apply to all other witnesses. Legislation of similar import prevails in most of the states. The spirit of this legislation has controlled the decisions of the courts, and steadily, one by one, the merely technical barriers which excluded witnesses from the stand have been removed, till now it is generally, though perhaps not universally, true that no one is excluded therefrom unless the lips of the originally adverse party are closed by death, or unless some one of those peculiarly confidential relations, like that of husband and wife, forbids the breaking of silence.

"In the light of these authorities and this legislation of Congress, there is less difficulty in disposing of this question."

In this case, as we understand it, it was held that Mrs. Rautzhan was a competent witness on the trial of Benson alone, although indicted jointly with him, whether called by the government or Benson.

Logan v. United States, 144 U. S. 263, 12 Sup. Ct. 617, 36 L. Ed. 429 (decided about a year before the Benson Case), was a case where the defendants Logan, Waggoner, Wallace and others were indicted for conspiracy and for murder in the prosecution of the conspiracy under section 5508, Revised Statutes (Comp. St. § 10183), and section 5509 of the Revised Statutes. The three defendants above named were tried and convicted on the charge of conspiracy in the United States District Court for the Northern District of Texas. At the trial the government offered as witnesses one Martin and one Spear. The defendants objected to their competency and produced certified copies of records showing that these witnesses had been convicted and sentenced for felony; that Martin was convicted in the state court of North Carolina

of felonious homicide and was sentenced in August, 1883, to imprisonment for six months, and served his sentence; that Spear was convicted in the state court of Texas on two charges which were felonies by the law of Texas and was sentenced in January, 1883, to two terms of imprisonment and served out his sentences. As to Spear the government offered and presented in evidence the proclamation of pardon issued to him by the Governor of Texas in May, 1889. In the opinion at pages 300 and 301 (12 Sup. Ct. 629) the court quotes extensively from the opinion of Chief Justice Taney in United States v. Reid, and particularly the statements therein to the effect that—

"The law by which, in the opinion of this court, the admissibility of testimony in criminal cases must be determined, is the law of the state, as it was when the courts of the United States were established by the Judiciary Act of 1789."

"The courts of the United States have uniformly acted upon this construction of these acts of Congress, and it has thus been sanctioned by a practice of 60 years."

And after reviewing the acts of Congress enacted since the decision in the Reid Case and pointing out that they had not changed the rule as there laid down, held that—

"The competency of witnesses in criminal trials in the courts of the United States held within the state of Texas is not governed by a statute of the state which was first enacted in 1858, but, except so far as Congress has made specific provisions upon the subject, is governed by the common law, which, as has been seen, was the law of Texas before the passage of that statute and at the time of the admission of Texas into the Union as a state."

The decision then points out that "At common law, and on general principles of jurisprudence, when not controlled by express statute giving effect within the state which enacts it to a conviction and sentence in another state, such conviction and sentence can have no effect, by way of penalty, or of personal disability or disqualification, beyond the limits of the state in which the judgment is rendered," and therefore held that the conviction of Martin in North Carolina did not render him incompetent as a witness in the District Court of Texas; and that Spear, who was convicted and sentenced in Texas, had been given a full pardon by the Governor of the state and was a competent witness by reason of the pardon. The question as to the admissibility of the records of conviction of Martin and Spear was not passed upon as the ruling on that question was in favor of the plaintiff in error.

In Rosen v. United States, 245 U. S. 467, 38 Sup. Ct. 148, 62 L. Ed. 406, Rosen and Wagner were indicted in the District Court of the United States for the Eastern District of New York with one Broder for conspiracy. Broder pleaded guilty and was afterward called as a witness by the government. The defendants objected to his competency on the ground that he had pleaded guilty to the crime of forgery in the second degree, in the Court of General Sessions in the County and State of New York, had been sentenced to imprisonment and had served his sentence. But notwithstanding the objection he was permitted to testify in the District Court. In its opinion the court refers to the Benson Case, decided in 1892, and says:

"In the almost twenty years which have elapsed since the decision of the Benson case, the disposition of courts and of legislative bodies to remove dis-

abilities from witnesses has continued, as that decision shows it had been going forward before, under dominance of the conviction of our time that the truth is more likely to be arrived at by hearing the testimony of all persons of competent understanding who may seem to have knowledge of the facts involved in a case, leaving the credit and weight of such testimony to be determined by the jury or by the court, rather than by rejecting witnesses as incompetent, with the result that this principle has come to be widely, almost universally, accepted in this country and in Great Britain.

"Since the decision in the Benson case we have significant evidence of the trend of congressional opinion upon this subject in the removal of the disability of witnesses convicted of perjury, Rev. Stats. § 5392, by the enactment of the federal Criminal Code in 1909 with this provision omitted and section 5392 repealed. This is significant, because the disability to testify, of persons convicted of perjury, survived in some jurisdictions much longer than many of the other common-law disabilities, for the reason that the offense concerns directly the giving of testimony in a court of justice, and conviction of it was accepted as showing a greater disregard for the truth than it was thought should be implied from a conviction of other crime.

"Satisfied as we are that the legislation and the very great weight of judicial authority which have developed in support of this modern rule, especially as applied to the competency of witnesses convicted of crime, proceed upon sound principle, we conclude that the dead hand of the common-law rule of 1789 should no longer be applied to such cases as we have here, and that the ruling of the lower courts on this first claim of error should be approved."

And it would seem from what is stated in this opinion and the headnote, taken in connection with what was said in the Benson Case—"today the tendency is to enlarge the domain of competency and to submit to the jury for their consideration as to the credibility of the witness those matters which heretofore were ruled sufficient to justify his exclusion"—that where a crime of which a witness has been adjudged guilty was such as at common law would have rendered him incompetent, the record of his conviction would now be competent evidence upon his credibility, he being allowed to testify. We think this is the logical deduction to be made from these decisions of the Supreme Court and the one necessary to be made in the administration of the law as outlined in these decisions.

[7] The question then arises: What were the crimes, the nature of which a record of adjudication would formerly render a witness incompetent, and may now be used to affect his credibility?

In Ex parte Wilson, 114 U. S. 417, 423, 5 Sup. Ct. 935, 938 (29 L. Ed. 89), it is said:

"The disqualification to testify appears to have been limited to those adjudged guilty of treason, felony, forgery, and crimes injuriously affecting by falsehood and fraud the administration of justice, such as perjury, subornation of perjury, suppression of testimony by bribery, conspiring to accuse one of crime, or to procure the absence of a witness; and not to have been extended to cases of private cheats, such as the obtaining of goods by false pretenses, or the uttering of counterfeit coin or forged securities. 1 Greenl. Ev. § 373; Utley v. Merrick, 11 Met. 302; Fox v. Ohio, 5 How. 410, 433, 434."

In Greenleaf's Evidence, vol. 1, §§ 372 and 373, the author, in speaking of the common-law rule of the disqualification of a witness, says that its basis seems to be that "infamous persons—i. e., persons convicted of heinous offenses—[are] morally too corrupt to be trusted to testify; so reckless of the distinction between truth and falsehood and insensible to the restraining force of an oath as to render it extremely

improbable that * * * [they] will speak the truth at all;" that "the usual and more general enumeration [of crimes that will render the perpetrator thus infamous] is, treason, felony and the crimen falsi. In regard to the two former, as all treasons, and almost all felonies, were punishable by death, it was very natural that crimes, deemed of so grave a character as to render the offender unworthy to live, should be considered as rendering him unworthy of belief in a court of justice;" and after discussing the cases bearing upon the meaning of the term crimen falsi in our law, he says:

"And from these decisions, it may be deduced, that the crimen falsi of the common law not only involves the charge of falsehood, but also is one which may injuriously affect the administration of justice by the introduction of falsehood and fraud."

In Logan v. United States, supra, at page 303 (12 Sup. Ct. 630), the Supreme Court approved the rule of the Massachusetts court (Commonwealth v. Green, 17 Mass. 515) and what appears to be the law as generally understood on the subject (see cases cited at page 303 [12 Sup. Ct. 630], in Logan v. United States) in holding that Martin, who had been convicted and sentenced for a felonious homicide in North Carolina, was not disqualified as a witness in the trial of Logan in the United States District Court for Texas, and, had it been called upon to do so, no doubt would have adopted the Massachusetts view of the common law, which appears to be the view of the common law as generally understood (1 Greenleaf, Ev. § 373) and held that as the crime of which Martin had been adjudged guilty was a felony, an infamous crime, the record of his conviction would have been admissible to affect his credibility. Commonwealth v. Knapp, 9 Pick. (Mass.) 496, 20 Am. Dec. 491; Gertz v. Fitchburg R. R. Co., 137 Mass. 77, 79, 50 Am. Rep. 285.

In Utley v. Merrick, 11 Metc. 302, a witness called by the plaintiff, who had been adjudged guilty in the court of common pleas of Massachusetts of obtaining goods upon false pretenses, was permitted to testify subject to exception, and the defendant offered in evidence the record of the judgment against him to affect his credibility, but it was excluded. A verdict having been found for the plaintiff, the defendant filed exceptions. It was held that in order to render the witness incompetent by his having been convicted of crime, "the crime must be such as to render him infamous, and therefore unworthy of credit for truth"; that, as the crime of which he was convicted was a mere misdemeanor, he was not rendered incompetent; and, as it would not disqualify him as a witness, it "ought not to be admitted to impeach his credit, any more than the conviction of any other misdemeanor," and overruled the exception.

The offense of keeping a house of ill fame, either under the common law or statutes of Massachusetts, is not a felony or infamous crime, but a public nuisance or misdemeanor (Commonwealth v. Smith, 138 Mass. 489; May's Criminal Law, § 181), and under its common law would not be admissible to affect the credibility of a witness (Utley v. Merrick, 11 Metc. [Mass.] 302), although it would have been during the life of the Act of 1852, c. 312, § 60, as that statute provided that

"the conviction of any crime may be shown to affect the credibility of any person testifying." Commonwealth v. Hall, 4 Allen (Mass.) 305, 306, 307. But at the time of the trial of this case, under the statutes of Massachusetts the record of a conviction of a witness of a misdemeanor could not be shown to affect his credibility after five years from the date on which the sentence of such conviction was imposed, unless he had subsequently been convicted of a crime within five years of the time of his testifying. Gen. Laws, Mass. c. 233, § 21. In this case the sentence of conviction was imposed more than ten years prior to the date of the trial. So that whether this evidence, the admissibility of which is here in question, be governed by the general common law, or the common law of Massachusetts, or the statute law of Massachusetts, it was incompetent to affect the credibility of the witness.

[8] The fifth assignment relates to testimony given by Rose Shaffer in this trial on direct examination, as to a conversation she had with Mrs. Marks (one of the defendants), which took place apparently between the time of the raid at 7 Walnut Park Road in the autumn of 1921 and the giving of the affidavit in January, 1922, to the effect that she told Mrs. Marks that fellow Myers owed her two weeks' rent and that Mrs. Marks laughed and said, "His name is Solomon, not Myers," and showed her a newspaper clipping. On being asked what the clipping said, she answered:

"I don't know. It was a long slip—so long; Charlie Solomon served 18 months; I don't know the rest. It was a long slip."

Counsel for Solomon excepted to this answer and asked to "have the last reply of the witness with reference to the eighteen months stricken out." The court then said he would hear counsel on his request and, on his stating that it was incompetent and introduced solely for the purpose of prejudicing his client in the minds of the jury, the court replied, "No." But on ascertaining that the district attorney did not expect to produce the slip of paper, he ordered the answer struck out and, addressing the district attorney, said:

"If I think the government's case is prejudiced by a ruling too severe against you, I will give you an opportunity to renew your offer."

The district attorney must have known that the statement made by the witness about Solomon's having served 18 months and the slip of paper containing the statement, if produced, were incompetent and prejudicial. He should have been required to withdraw the statement and the court should have instructed the jury to disregard it. Instead, the jury were given to understand that it was not prejudicial to the defendant, but that, if anything, its exclusion was prejudicial to the government. We do not find it necessary to say more about this question, nor to consider the one raised by the sixth assignment, as neither are liable to arise upon a new trial.

The judgment of the District Court is reversed; the verdict is set aside, and the case is remanded to that court for further proceedings not inconsistent with this opinion.