## HENDERSON v. UNITED STATES.
### No. 11368.

United States Court of Appeals
Sixth Circuit.

Decided Feb. 27, 1953.
Rehearing Denied April 30, 1953.
See 204 F.2d 126.

C. P. J. Mooney and Eugene P. Boyd, Memphis, Tenn., on the brief, for appellant.

John Brown, Thomas C. Farnsworth and Edward N. Vaden, Memphis, Tenn., for appellee.

Before SIMONS, Chief Judge, and Mc-ALLISTER and MILLER, Circuit Judges.

MILLER, Circuit Judge.

Appellant, J. Stacey Henderson, was indicted, together with J. Lewis Rout and Guy L. Parker, under a 10-count indictment, four of which counts were under the Mail Fraud Statute, § 1341, Title 18, U.S.Code, five of which counts were under the Security and Exchange Statute, § 77, Title 15 U.S.C., with the remaining count being a conspiracy charge under § 371, Title 18, U.S.Code. Appellant was tried alone, a severance being granted as to Rout and Parker. A jury found appellant guilty under Count 1 of the indictment, which involved the Mail Fraud Statute, and not guilty under the remaining nine counts. He was sentenced to five years' imprisonment and a fine of $1,000, from which judgment this appeal was taken.

Count 1 of the indictment charges that from June 9, 1948, and continuing up to the date of the filing of the indictment, namely, September 6, 1950, the defendants devised a scheme and artifice to defraud various parties named therein and others too numerous to set out, being persons who could be induced to invest in fractional undivided interests in oil and gas rights, the scheme in substance being as follows. Henderson was an oil well operator engaged in the promoting and drilling of exploratory wells for oil and gas; that

402

he acquired an oil and gas lease covering 33.45 acres of land in Caddo Parish, Louisiana, called Tract No. 1, which he divided into fractional undivided interests or units of ⅟₃₂nd each, which were offered to members of the public at a price of $1,000 per unit; that thereafter Henderson also acquired an oil and gas lease on 5.13 acres of land adjoining the 33.45 acres in Caddo Parish, Louisiana, called Tract No. 2, which he divided into fractional undivided interests or units of ⅟₆₄th each, which were offered to the public at a price of $1,000 per unit; that the defendants thereupon engaged in intensive sales campaigns to distribute the units to the public generally, and for the purpose of deceiving and misleading investors and to induce them to invest in said oil and gas interests, made divers false and fraudulent representations and promises, which they knew to be false when made, which representations were (a) that an oil well being drilled by Henderson on Tract No. 1 was located about 50 feet away from a well which had been drilled by the Gulf Refining Company, which was completed with an initial production of 1,600 barrels per day, but due to faulty cementing, the well blew out and was lost, (b) that as a result of said blowout, the landowner sued the Company for negligence on account of the faulty cementing of the well, with the result that the lease was involved in litigation for a number of years, and because of which no further effort was made by the Gulf Refining Company to develop the property, (c) that when the litigation was settled a political friend of Henderson acquired this valuable lease and Henderson was able to purchase it from him for the sum of $6,500, (d) that the pool had been undrained since the blowout and lawsuit, that oil was still under Tract No. 1, and it was only necessary to drill a well and provide the necessary equipment to produce it, (e) that an oil and gas lease could be purchased on land adjoining Tract No. 1 for the sum of $250 and that if this sum were advanced to Henderson prior to the bringing in the well on Tract No. 1 this money would be used by Henderson for the purchase of said lease, (f) that Henderson's well on Tract

No. 1 had come in in a big way, and that information gained in drilling this well had made it certain that the mother pool was under Tract No. 2 where he was to drill a new well, and that he would guarantee that the new well would produce 300 to 1,000 barrels of oil per day, and (g) that he would guarantee that the production in the well on Tract No. 2 would double the production of the well on Tract No. 1, and for that reason there would be 64 undivided interests sold at $1,000 each in the well on Tract No. 2, whereas he was limiting the well on Tract No. 1 to 32 undivided interests; and that for the purpose of executing the scheme and artifice the defendants on or about November 27, 1948, knowingly caused to be delivered by mail, according to the directions thereon, a check dated November 27, 1948, in the amount of $500 drawn by J. W. Keller on the Hardeman County Savings Bank, enclosed in an envelope addressed to Mr. Jack Pirtle, c/o Hi-Hat Cafe, Memphis, Tennessee.

Appellant's defense was that he acted in the utmost good faith in these transactions, and, based upon all the information coming into his possession, he thought there was an excellent opportunity of securing production on both the leases; that his obligations under his contracts with the investors were to drill the designated test wells which obligation he fully performed; and the fact that the leases failed to produce oil or that the appellant did not spend all of the money received from the sale of the undivided interests in performing his drilling operations did not constitute the venture a scheme or artifice to defraud. With particular reference to the Keller transaction set out in Count No. 1, he claimed that Keller was a volunteer investor to whom no representations had been made; that no misrepresentations of fact had been made with respect to Tract No. 2 in which Keller bought his undivided interests; and that the appellant did not in any way cause Keller to mail his check in payment of his undivided interest in Tract No. 2.

On this appeal, appellant contends that it was error on the part of the District Judge to overrule his motion for a

judgment of acquittal made at the close of the Government's evidence and renewed at the conclusion of all the evidence, in that there was no substantial evidence that he was guilty of any scheme to defraud as charged, or that the use of the mails in the Keller transaction was for the purpose of executing the alleged scheme, or that any of the alleged misrepresentations were made with the intent to influence, or did in fact have any influence on Keller. He also complains of the admission of incompetent evidence to his substantial prejudice. For the purposes of determining whether the evidence was sufficient to support the conviction, we must take that view of the evidence, with inferences reasonably and justifiably to be drawn therefrom, most favorable to the Government, and to determine therefrom whether the finding was supported by substantial and competent evidence, and where there is substantial and competent evidence, which if believed, supports the conviction, the appellate court can not weigh the evidence or determine the credibility of witnesses. Direct proof of willful intent is not necessary. It may be inferred from the acts of the parties, and such inference may arise from a combination of the acts, although each act standing by itself may seem unimportant. It is a question of fact to be determined by the jury from all the circumstances. Battjes v. United States, 6 Cir., 172 F.2d 1, 5.

We are of the opinion that there was substantial evidence on the part of the Government tending to show a scheme or artifice to defraud. Evidence was introduced showing that Henderson, with some unfavorable experience in the promotion and drilling of exploratory wells for oil, and without funds, moved to Memphis in May or June, 1948, where he undertook to meet and interest certain people in an oil lease held by him. This lease on a 33.45-acre tract in Caddo Parish, Louisiana, was acquired by Henderson from C. B. Lambert on August 14, 1948, for approximately $500. Henderson told several investors that he was able to secure the lease through a political friend for $6,500. He also told investors that this tract had produced a 1,600-barrel well a day, but that litigation had tied up the tract for about 20 years. There was evidence showing that in 1908, the Gulf Refining Company had a lease of 245 acres which included the two tracts herein involved, and that during the next two or three years they drilled wells on the entire tract with four or five located on the 33-acre tract. These wells were pumped out and thereafter abandoned by Gulf Refining Company by 1914. There was evidence negativing any litigation regarding this tract of land. Henderson's operations were a straight drilling operation and not a secondary recovery or other operation usually used to secure oil from depleted fields. The marketing of the 32 units would produce about $30,000. Henderson told Rout that it would cost about $5,000 to get the hole drilled and estimated that there was a possible profit of $20,000 out of the first tract. He stated to Rout "there was money to be made on top of the ground as well as from under it," and that in the event of a dry hole he could charge that to poor geology or lay it on the geologist. There were sold $34\frac{1}{4}$ units of $\frac{1}{32}$nd each, resulting in an oversale of the existing units. Henderson knew it was oversold. This resulted in Henderson retaining no interest in this tract.

Operations on Tract No. 1 started in August, 1948. After drilling about 800 feet, material difficulties were encountered and operations were abandoned on that particular well and were moved over a few hundred feet to another location where Henderson drilled another well to 2,350 feet. Oil was struck, the flow of which quickly decreased in volume. Over a period of time there was a total production of approximately 100 barrels of commercial oil, and operations on Tract No. 1 were abandoned.

Henderson secured the lease on Tract No. 2 from Lambert at about the time of the completion of the second well on Tract No. 1. No consideration was paid for the lease. Following the failures of the wells on Tract No. 1, Henderson began selling fractional interests or units of a one-sixty-fourth interest in Tract No. 2, at $1,000 a unit. In support of the increased price

compared to the 32 units in Tract No. 1, Henderson represented that his proposed drilling on Tract No. 2 was a "sure thing, practically." He stated to prospective investors at a meeting "I am going to make myself $50,000 in the next year and I will make you people as much," "that it was much better than the first tract" and "that it was a sure thing. That is all." With reference to the well, Henderson stated that "the mother pool was bound to be there because it would be directly between two producers and that would be the mother pool." Jack Pirtle testified that Henderson assured him that it would be producing between 500 and 1,000 barrels of oil a day because it was against the fault line and also was within the range of the mother pool; that he would bet a $1,000 to anybody that it would do it, and that if it wouldn't do it he would give them a $1,000; that the lease could be purchased for $250, which he Henderson did not have, and that at Henderson's suggestion, Pirtle gave him a check for $250 to swing the deal. Pirtle also testified that Henderson stated to him "anybody knows of any friends that want any of this stock, you know it is good, we know it. It is fine and will produce, because there is oil there in this pool," and also "there is no way to lose. If you know anybody who wants in this stock tell them. Then if you have as many as four or five friends who want to get a unit, I will give you a unit."

During the first week in December, 1948, the well had been completed on Tract No. 2. It proved to be a dry hole. Henderson moved from Memphis to Shreveport about January 1, 1949.

 We are of the opinion that the foregoing evidence, although much of it denied by appellant, sustains the action of the trial judge in overruling appellant's motion for acquittal, and in submitting the case to the jury, and that on the present review such evidence supports the verdict. There was substantial evidence pertaining to misrepresentations of some material facts, such as the manner of acquisition of Tract No. 1, and the consideration paid for both tracts. The depleted condition of both leases, the small consideration paid for them, the lack of interest in them on the part of any of the major oil producing companies operating in that area, the failure of the appellant to retain any interest himself in Tract No. 1, the inflated sale price of the fractional interests, the statements of Henderson to Rout, form a substantial basis for the reasonable inference that Henderson devised and operated under a scheme that was designed to produce substantial funds from credulous investors, but which had no reasonable prospect of success, about which his representations far exceeded the permissible limits of the usual "sales talk." A scheme to defraud, within the meaning of the statute, may exist although no misrepresentation of fact is made. Deaver v. United States, 81 U. S.App.D.C. 148, 155 F.2d 740, 744; McCarthy v. United States, 2 Cir., 187 F. 117, 118; Fournier v. United States, 7 Cir., 58 F.2d 3, 5; Shushan v. United States, 5 Cir., 117 F.2d 110, 115; Stephens v. United States, 9 Cir., 41 F.2d 440, 443–444; United States v. McKay, D.C.E.D. Mich., 45 F.Supp. 1007, 1012. Representations as to value, soundness, and worth of securities may go so far beyond the proper limits of the enthusiasm of the normal salesman, or the mistaken judgment of the honest man, as to impress them with the badge or mark of fraud. Holmes v. United States, 8 Cir., 134 F.2d 125, 133, certiorari denied 319 U.S. 776, 63 S.Ct. 1434, 87 L. Ed. 1722; Durland v. United States, 161 U.S. 306, 313, 16 S.Ct. 508, 40 L.Ed. 709; United States v. Comyns, 248 U.S. 349, 353, 39 S.Ct. 98, 63 L.Ed. 287.

Appellant's theory of the transactions and his defense to the indictment were fully presented to the jury by the charge of the District Court. In addition to instructing them about the necessity of finding the existence of a scheme or artifice to defraud, false pretenses being defined in as liberal a way as appellant could reasonably contend for, the Court told the jury that it must distinguish false pretenses from puffing or legitimate "sales talk," that good faith was a complete defense to a mail-fraud charge, and if the appellant acted in good faith in the making of representations with respect to material matters, then the jury

should return a verdict of not guilty; that a scheme to defraud could not be found in any mere expression of an honest opinion as to the quality or future performance of property, but there must be an underlying intent to defraud which must be proved beyond a reasonable doubt before the appellant could be found guilty of fraud; and that the issues of fraud were not to be determined by the fact that the appellant may or may not have made a profit in these transactions, or that those buying units lost their money.

We find no merit in appellant's contention that no act of his caused Keller to mail his check for $500 in payment of a fractional interest in Tract No. 2, in that Keller was a volunteer purchaser to whom no representations had been made. Appellant points out that Keller became interested in the project through conversation with other purchasers and believing it to be a good deal, without being solicited by the appellant or any of his agents, decided to purchase an interest, and mailed his check to Pirtle through whom he made the purchase. But this overlooks Pirtle's testimony that prior to sending the check Keller called Pirtle on the phone making inquiry about the matter, that Pirtle told him he would see Parker, who was working with appellant, about it, and after talking to Parker he phoned Keller and told him to mail the check and the papers would be sent to him. Pirtle was acting as an intermediary for appellant and Parker. Although Keller's initial interest in the project was not the result of direct solicitation by appellant, it was the indirect result of appellant's promotional scheme. Thereafter, the mailing of the check was the direct result of instructions from appellant's agent. In order to come within the terms of the statute, it is not necessary that the victim be deceived. The offense is committed when the scheme has been devised, and in pursuance of it the mail has been used. Norman v. United States, 6 Cir., 100 F.2d 905, 907; Grant v. United States, 6 Cir., 268 F. 443, 447; United States v. McKay, supra, D.C.E.D. Mich., 45 F.Supp. 1007, 1012. It is not necessary that the scheme was intended to be executed by the use of the mail. If, in the execution of the scheme the mail is in fact used, even though it be incidental and unpremeditated, the statute is violated. Bogy v. United States, 6 Cir., 96 F.2d 734, 740; Hendrey v. United States, 6 Cir., 233 F. 5, 8; Shea v. United States, 6 Cir., 251 F. 440, 447–448.

A more serious question is presented by appellant's contention that the District Judge erred in permitting the Government to cross-examine him, over objection, about an Army court-martial in 1925. Government counsel brought out by this cross-examination that the appellant had gone AWOL (Absent Without Official Leave) several times during his enlistment in the Army about 1925, and had had several court-martials. On re-direct examination, appellant stated that he had been absent without leave several times, but returned voluntarily to his assignment; that he had served several short periods of time in the guard house for what he thought was AWOL; and that he served out his enlistment and received an honorable discharge. The District Judge instructed the jury that the evidence could be considered only on the question of the credibility of the witness.

It is well settled that when a defendant in a criminal trial takes the stand in his own defense he waives immunity from cross-examination, and is, like any other witness in the case, subject to impeachment as to his credibility. Banning v. United States, 6 Cir., 130 F.2d 330, 337. It is likewise settled that for the purposes of such impeachment it is competent to show that the witness has been previously convicted of a felony. McLendon v. United States, 6 Cir., 13 F.2d 777, 778. There is some conflict in the authorities as to whether the accused may be cross-examined as to a prior conviction of a misdemeanor, or whether such cross-examination is limited to convictions for felonies or crimes involving moral turpitude. See Annotation, 103 A.L.R. 350, 362, 365.

Rule 26, Rules of Criminal Procedure, 18 U.S.C. provides that the admissibility of evidence and the competency

and privileges of witnesses in criminal trials in the federal courts shall be governed, except when an Act of Congress or the Rules otherwise provide, by the principles of the common law as they may be interpretated by the Courts of the United States in the light of reason and experience. Funk v. United States, 290 U.S. 371, 54 S. Ct. 212, 78 L.Ed. 369; Wolfle v. United States, 291 U.S. 7, 12, 54 S.Ct. 279, 78 L.Ed. 617. At common law the inquiry was limited to felonies or crimes involving moral turpitude. Wigmore on Evidence, 3rd Ed., § 980(2)(a), 519, 520; Campbell v. United States, 85 U.S.App.D.C. 133, 176 F.2d 45; Keith v. State, 127 Tenn. 40, 44, 152 S.W. 1029; Coble v. State, 31 Ohio St. 100; Bartholomew v. People, 104 Ill. 601; See Nesbit v. Cumberland Contracting Co., Md., 75 A.2d 339, 20 A.L.R. 2d 1212. We are of the opinion that the cross-examination should be limited to showing convictions for felonies or crimes involving moral turpitude. Middleton v. United States, 8 Cir., 49 F.2d 538, 540; Haussener v. United States, 8 Cir., 4 F. 884, 887; United States v. Montgomery, 3 Cir., 126 F.2d 151, 155; Scaffidi v. United States, 1 Cir., 37 F.2d 203, 211; Solomon v. United States, 1 Cir., 297 F. 82, 94; See Banning v. United States, supra, 6 Cir., 130 F.2d 330, 337; Pearson v. United States, 6 Cir., 192 F.2d 681, 699; Mitrovich v. United States, 9 Cir., 15 F.2d 163, 164, C.A.9th; Contra: United States v. Cohen, 2 Cir., 177 F.2d 523, 525. Under this view of the law, it was error for the District Judge to admit the evidence pertaining to appellant's court-martial record some twenty-seven years prior thereto. People v. Flynn, 275 App.Div. 350, 89 N. Y.S.2d 28; People v. Wilson, 400 Ill. 461, 81 N.E.2d 211. See Grigsby v. Commonwealth, 299 Ky. 721, 187 S.W.2d 259, 159 A.L.R. 196; Powell v. Commonwealth, 308 Ky. 467, 214 S.W.2d 1002; People v. Levan, 295 N.Y. 26, 64 N.E.2d 341.

■ We think it was also error on the part of the District Judge to admit, over objections of appellant, the testimony of Avis Ransom that appellant had stated to her that his brother had been in the penitentiary.

■ Rout and Parker were joined as co-defendants with appellant in the indictment. Each of the three defendants pleaded not guilty. Rout and Parker were witnesses for the Government in this trial. The District Judge in his charge to the jury told the jury that they were in law classed as accomplices, and then correctly gave the rule with respect to the credibility of accomplices as witnesses. In view of the pending pleas of not guilty and the fact that they at that time had not been brought to trial, it would have been better for the trial judge not to have classified them as accomplices as a matter of law, and to have avoided any inference that they had admitted the commission of the offense or that they had been tried and convicted. United States v. Balodimas, 7 Cir., 177 F.2d 485, 487–488.

In view of the foregoing, we are of the opinion that there was sufficient prejudice to the rights of the appellant to require that the verdict and judgment be set aside, and that the cause be remanded to the District Court for a new trial.

It is so ordered.

McALLISTER, Circuit Judge (dissenting).

On a trial on ten counts of the indictment, appellant was found not guilty on nine counts and guilty on one count. This count set forth that appellant, for the purpose of executing a scheme, knowingly caused to be delivered by mail on November 27, 1948, a check for $500, which was mailed by Keller to Pirtle. Pirtle was a purchaser of interests in the project and concerned in its success. He was not a salesman of such interests, and he was accused of no wrongdoing, but was one of those claiming to be defrauded.

It is true that to come within the terms of the statute of using the mail in a scheme to defraud, it is not necessary that the victim be deceived, nor that the scheme be intended to be executed by the use of the mail. Even though it be incidental and unpremeditated, if, in the execution of the scheme, the mail is, in fact, used, the statute is violated. The offense is committed

when the scheme has been devised and, in pursuance of it, the mail has been used.

In this case, appellant made no representations to Keller, and Keller did not even know that appellant was associated in the matter until long after he had mailed his check to Pirtle; and Pirtle himself made no representations to Keller. Keller sent his check through the mail to purchase the interest without any inquiry about the matter or without any persuasion on the part of anyone. He stated that he had known Pirtle for a long time and just mailed his check to him for the purpose of buying an interest.

There must be some relationship between the transaction involving the use of the mail and the scheme to defraud. McLendon v. United States, 6 Cir., 2 F.2d 660. Keller had heard nothing whatever about the alleged scheme and had mailed his check without any knowledge concerning it. The mailing of the check was in no way related to a scheme to defraud. It, accordingly, was not mailed in furtherance of or execution of such a scheme. The record discloses no evidence to support appellant's conviction on Count 1 of the indictment.

The judgment should, accordingly, be reversed, and appellant discharged.